840 F.Supp. 697 (1993)
BEVERLY HILLS FOODLAND, INC., Plaintiff,
v.
UNITED FOOD & COMMERCIAL WORKERS UNION, LOCAL 655, Defendant.
No. 90-2095C(5).
United States District Court, E.D. Missouri, E.D.
December 14, 1993.
*698 *699 Terry A. Bond, Partner, Vines and Ross, St. Louis, MO, for plaintiff.
Greg A. Campbell, Jerome A. Diekemper, Sherrie A. Schroder, Diekemper and Hammond, St. Louis, MO, for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
This case was removed to federal court on November 5, 1990 based upon federal preemption by the National Labor Relations Act, 29 U.S.C. § 141 et seq. (as amended). The case was originally assigned to Judge Clyde S. Cahill. On May 4, 1993 the case was reassigned to this Court. On September 9, 1993 the plaintiff filed a ten (10) count second amended complaint alleging that the defendant's picketing and boycotting activities defamed the plaintiff and tortiously interfered with the business relationship with its customers. In its second amended complaint, Counts I and IV seek damages for libel in connection with handbills passed out by the defendant; Counts III and V seek damages for slander in connection with remarks made during a telephone conversation between defendant's representative and a representative of the local Congress of Racial Equality (CORE) chapter, and statements made by the defendant's picketers to potential customers of the plaintiff; and Count II seeks damages for the defendant's tortious interference with the right of contract (i.e. defendant's actions allegedly caused the plaintiff to lose business due to the decrease in consumer shopping). Counts VI through X are the same as Counts I through V, respectively, except for the added allegation of actual malice. This matter is before the Court on the defendant's motion for summary judgment (#27), filed June 11, 1993 and renewed (following the filing of the second amended complaint) on September 9, 1993. Responsive pleadings have been filed. This case is currently set on the Court's December 27, 1993 jury trial docket.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the *700 moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
The pertinent material facts in this case are not in dispute. The plaintiff is the owner of the (now defunct) Beverly Hills Foodland Supermarket at 6700 National Bridge, in the City of Beverly Hills, St. Louis County, Missouri. Beverly Hills is a predominantly Afro-American community. Defendant United Food & Commercial Workers Union, Local 655 (hereinafter referred to as simply Local 655) is a labor organization within the meaning of the National Labor Relations Act (NLRA), 29 U.S.C. § 152(5).
On or about April 23, 1989 Beverly Hills Foodland opened for business. Shortly thereafter, representatives of Local 655 contacted the supermarket's owners about unionizing the employees. Foodland rejected the unionization overtures. Local 655 then began to conduct organizational activities on Foodland's premises. Foodland reacted negatively to these organizational activities; in fact, it called the police to have union organizers removed from the parking lot. After this incident, on or about April 21, 1989, Local 655 filed a complaint against Beverly Hills Foodland with the National Labor Relations Board alleging unfair labor practices. On June 22, 1989 a settlement was reached in which Foodland was required to post a notice in its store for sixty (60) days stating that it would not interfere with Local 655's peaceful organizational activities. Affidavit of Patrick McDonough (Local 655's business representative).[1]
On July 10, 1989 Local 655 notified plaintiff, in writing, that "we are ceasing any and all organizing activities at Beverly Hills Foodland, 6700 Natural Bridge ..." and that Local 655 "has no intentions to continue our present organizing efforts of your employees, and we are not seeking to have your company recognize Local 655." Finally, the union declared that in regard to "those employees who have expressed an interest in our organizing activities, we are not asking anyone to withhold their services." Letter of July 10, 1989 written by Patrick McDonough and addressed to Terrance LeGrand (one of the owners of Beverly Hills Foodland). Thereafter, Local 655 no longer was present on the plaintiff's premises.
However, in November 1989, it came to the defendant's attention that the plaintiff was paying its employees wages and benefits lower than those paid in nearby unionized grocery stores; that its owners and managers were white, while its non-management employees were predominantly black; that most of the black employees were employed on less than full-time status (while most of the white employees were full-time); and that its owners, managers, and employees mainly resided outside of the Beverly Hills community. On November 3, 1989 Local 655 conducted a comparison of prices ("price survey") charged by the plaintiff and the unionized National store (at 91 North Oaks) for the *701 same items. The cash register receipts showed that plaintiff charged 9% more than the National store. Affidavit of Patrick McDonough and exhibits attached, filed August 9, 1991.
Thereafter, Local 655 conducted a campaign which included picketing by union members, on the plaintiff's premises, holding placards proclaiming that Foodland was "unfair" to its employees and asking the public not to patronize Foodland. Flyers were mailed to nearby residents asking them to boycott Foodland because it was non-union and to ask Foodland certain questions regarding its employment practices. A handbill was distributed on the plaintiff's premises which identified the plaintiff as a "rat" for paying wages and benefits lower than those paid at the unionized grocery stores.[2] The picketing took place from November 1989 to April 1990. It appears that the flyers were distributed between mid-November 1989 through December 1989.
From April 1990 to May 1990 Local 655 rented a billboard approximately two blocks from the plaintiff's supermarket. Defendant used this billboard to urge the public to boycott the Foodland supermarket because of its non-union status.
Finally, on or about April 26 or 27, 1990 defendant's business representative, Patrick McDonough telephoned Gene Fowler, the City Chairman for the Congress of Racial Equality (CORE). During this conversation, McDonough made certain remarks to Mr. Fowler in which he referred to the owner(s) of Beverly Hills Foodland as "racist". Affidavit of Gene Fowler, filed December 12, 1991. Plaintiff further alleges, which the defendant does not appear to dispute, that picketers told potential shoppers at Foodland that the owner(s) were "racist". Local 655's campaign ceased in May 1990 as a result of the NLRB's ruling on a complaint filed by CORE against Local 655. Beverly Hills Foodland closed for business permanently on December 29, 1990.
Defendant seeks summary judgment, as to all counts, because it claims its campaign activities were protected under the federal labor laws and the First Amendment. It argues that the plaintiff's state tort claims for defamation are not actionable because 1) the activities complained of took place during a labor dispute, consequently, plaintiff must show actual malice on the part of the defendant, which it has failed to do so; and 2) terms such as "unfair", "rat", and "racist" are not considered defamatory when used during a labor dispute. Defendant further contends that the plaintiff has failed to prove all the elements necessary for a successful claim of tortious interference. Plaintiff counters that the defendant's activities did not take place during a "labor dispute"; i.e. that any such dispute ended with Patrick McDonough's letter of July 10, 1989. Since there was no labor dispute, plaintiff contends that the defendant's activities are not accorded the protection of the federal labor laws or the First Amendment. Plaintiff does not address the defendant's argument as to its failure to prove the necessary elements of a tortious interference claim.
The first issue that must be addressed is whether or not Local 655's campaign activities from November 1989 to May 1990 were conducted during a "labor dispute".[3] If the activities complained of occurred within a "labor dispute", then the plaintiff's state tort claims are preempted by federal labor law. The NLRA defines the *702 term "labor dispute" to include "any controversy concerning terms, tenure, conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 152(9).
The plaintiff contends that no labor dispute existed once the settlement agreement was reached with the NLRB on June 22, 1989 or at the very latest, on July 10, 1989 pursuant to Patrick McDonough's letter notifying the plaintiff that Local 655 was terminating its organizational and recognitional efforts. Plaintiff contends that a labor dispute only existed during the time the union was attempting to organize the plaintiff's employees. It contends that given the policy of the federal labor laws to encourage workers to have freedom of association and designation of representatives to negotiate working conditions, "no labor dispute can exist when the only controversy is the employer's refusal to comply with a union's demand that the employer recognize the union and compel its employees to affiliate with it" and furthermore, "there can be no labor dispute when the union falsely represents that the plaintiff pays inadequate compensations to its employees and subjects them to unhealthful working conditions." In support of this argument, plaintiff cites the Missouri case of Donnelly Garment Co. v. Int'l Workers Union, 20 F.Supp. 767 (W.D.Mo.1937).
Before addressing the merits of the plaintiff's argument, the Court must first address two significant factual errors present in the plaintiff's position. Firstly, there is absolutely no evidence that during the time period contemplated in the plaintiff's second amended complaint, defendant made any demands upon the plaintiff that plaintiff recognize the union and compel its employees to join the union. Nowhere in the said complaint is it alleged that such demands were made upon the plaintiff by the defendant during the time in question. Secondly, the Donnelly case cited by the plaintiff was vacated by the United State Supreme Court on jurisdictional grounds. International Ladies Garment Workers Union v. Donnelly, 304 U.S. 243, 58 S.Ct. 875, 82 L.Ed. 1316 (1938). The case was remanded to the District Court for the Western District of Missouri, and in subsequent proceedings the court held that a labor dispute did exist at the time rival unions competed for the organization of the Donnelly employees. Donnelly v. Dubinsky, 55 F.Supp. 587 (W.D.Mo.1944). This decision was later affirmed by the Eighth Circuit Court of Appeals. Donnelly v. Dubinsky, 154 F.2d 38 (8th Cir.1946).
Whether a labor dispute exists within the meaning of 29 U.S.C. § 152(9) is a question of law for this Court to decide. Hasbrouck v. Sheet Metal Workers Local 232, 586 F.2d 691 (9th Cir.1978). Contrary to the plaintiff's assertion, courts have routinely found that a "labor dispute", within the context of the NLRA, exists in situations which do not involve any organizing activities by a union. "A union picketing or boycotting a business which it has not tried to organize (and in some cases cannot organize) nevertheless involves a labor dispute. Aarco v. Baynes, 391 Mass. 560, 462 N.E.2d 1107, 1110 n. 3 (1984); see also, Railway Labor Executives Association v. Wheeling & Lake Erie Ry., 914 F.2d 53 (4th Cir.1990) (application of identical "labor dispute" definition under Norris-LaGuardia Act to union picketing railroad in attempt to force hiring of displaced non-union and union workers of another railroad); Barss v. Tosches, 785 F.2d 20 (1st Cir.1986) (union picketing of "open shop" construction firm, i.e. uses non-union sub-contractors).
As the statutory definition clearly states, the existence of a labor dispute does not depend upon the existence of an employer-employee relationship. As long as the union acts for some job-related reason in order to exert economic pressure, the conflict constitutes a labor dispute. "Rarely have courts found concerted union activities to fall outside this broad definition. Where the union acts for some arguably job-related reason, and not out of pure social or political concerns, a `labor dispute' exists." Hasbrouck, at 694 n. 3; Aarco, 462 N.E.2d at 1110.
*703 This principle has been especially applicable in defamation cases, such as the present one. The partial preemption of state libel remedies "cannot depend on some abstract notion of what constitutes a `labor dispute' ... but must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to the protection for freedom of speech are significantly implicated." National Association of Letter Carriers v. Austin, 418 U.S. 264, 279, 94 S.Ct. 2770, 2778-79, 41 L.Ed.2d 745 (1974). Such a situation marked the conflict in the instant matter and the activities of Local 655. The events of November 1989 through May 1990 characterized a "labor dispute"; consequently, the allegedly libelous and slanderous statements and terms were made in the context of a labor dispute.
The United States Supreme Court has squarely addressed the issue of the extent to which state libel laws may be applied to statements made in the course of labor disputes "without undermining the freedom of speech which has long been a basic tenet of federal labor laws." Letter Carriers v. Austin, 418 U.S. at 270, 94 S.Ct. at 2774. In Linn v. Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1965), the Court recognized the need to accommodate the conflicting interests of free debate on labor-management issues and "the federal interest in uniform regulation of labor relations with the traditional concern and responsibility of the State to protect its citizens against defamatory attacks." Linn, 383 U.S. at 57-58, 86 S.Ct. at 660. It observed that "[l]abor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable per se in some state jurisdictions ... [b]oth labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." Id., at 58, 86 S.Ct. at 661. Although the Court recognized that Congress' enactment of the NLRA, especially Section 8(c), manifested its intent not to have the "frankness" of labor debate compromised by the threat of state libel suits, it nevertheless felt a need to offer some protection from unjustifiable character assassinations. "Such considerations likewise weigh heavily here; the most repulsive speech enjoys immunity provided it falls short of deliberate or reckless untruth. But it must be emphasized that malicious libel enjoys no constitutional protection in any context." Id., at 63, 86 S.Ct. at 663. The Court struck its balance by limiting "the availability of state remedies for libel to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." Id., at 65, 86 S.Ct. at 664.
In 1973, the Supreme Court more clearly defined the Linn standard for federal preemption of state libel remedies regarding allegedly defamatory statements made/published during a labor dispute. The Court found that the "Linn Court explicitly adopted the standards of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and the heart of the New York Times test is the requirement that recovery can be permitted only if the defamatory publication was made `with knowledge that it was false or with reckless disregard of whether it was false or not'. Id., at 280, 84 S.Ct. at 726. The adoption in Linn of the reckless-or-knowing falsehood test was reiterated time and again in the Court's opinion. See 383 U.S. at 61, 63, 65, 86 S.Ct. at 662, 663, 664." Letter Carriers v. Austin, 418 U.S. at 281, 94 S.Ct. at 2779-80. The Court went on to state that ill will towards the plaintiff, bad motives, hatred, spite, or even desire to injure are not elements of the New York Times test; thus, not to be considered in applying the Linn standard. Id., 418 U.S. at 281, 94 S.Ct. at 2779-80.
The Austin Court went on to apply the Linn standard to a situation in which, during a labor dispute, a union newsletter used the epithet "scab", a literary piece by author Jack London defining a "scab", and the term "traitor" in reference to the plaintiff, a postal worker who had refused to join the postal union. The Court first found that the epithet "scab" was "literally and factually true" as used in reference to the plaintiff because one of the generally accepted definitions of "scab" is "one who refuses to join a union." Id., 418 U.S. at 283, 94 S.Ct. at 2780. Although the Court recognized that the word "scab" was used as an insult, it reasoned that *704 such a word was not defamatory because its use is common in labor disputes and "Linn recognized that federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." Id., 418 U.S. at 283, 94 S.Ct. at 2781. As for the publication of Jack London's rhetoric, the Court found that it was equally entitled to the protection of the federal labor laws because the "sine qua non of recovery for defamation in a labor dispute under Linn is the existence of falsehood". Id., 418 U.S. at 283, 94 S.Ct. at 2781. "Before the test of reckless or knowing falsity can be met, there must be a false statement of fact" and since the only factual statement in the disputed publication was the claim that the plaintiff(s) were "scabs", and the plaintiff(s) were in fact "scabs", the Jack London literary piece was not considered defamatory. Id., 418 U.S. at 284, 94 S.Ct. at 2781.
In considering the word "traitor", the Court found that the word "traitor" could not be construed as a representation of fact. It was considered to be in the same category as words like "unfair" and "facist" that were commonly used in labor disputes in a "loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization." Id., 418 U.S. at 284, 94 S.Ct. at 2781 citing Cafeteria Employees Local 302 v. Angelos, 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943). The Court considered the word "traitor" to be nothing more than an opinion and the "[e]xpression of such an opinion, even in the most pejorative terms, is protected under federal labor law." Id., 418 U.S. at 284, 94 S.Ct. at 2781.
In the present matter, the plaintiff contends that the picket signs proclaiming that Foodland was "unfair" to its employees, that it was discriminatory in its hiring and promotion practices with regard to minorities, that it does not draw its workforce from the local community or reinvest its profits into the local community, that its prices were an average of 9% higher than those of a nearby National supermarket, and that the owners of Foodland were "rats" were defamatory in that such statements exposed the plaintiff to public hatred, contempt and ridicule. Plaintiff further contends that such statements were false and resulted in damage to its public image and business reputation, the consequence of which was significant loss of business profits.
In order to recover under Linn, a plaintiff involved in a labor dispute must prove that the allegedly defamatory statements were published with knowledge of their falsity or with reckless disregard for whether they were true or false. Linn, supra.; Letter Carriers v. Austin, supra.; Barss v. Tosches, supra. Here, the plaintiff must provide clear and convincing evidence that the allegedly defamatory statements, as noted above, were published with actual malice in order to recover. The Court finds that the plaintiff has failed to do so.
As a preliminary matter, the Court notes that the plaintiff has only made broad general allegations of defamatory "telephone solicitations and mass mailings" in its second amended complaint; however, it specifically refers to published statements in certain flyers which it attaches to the complaint as Exhibits 1 and 2. Since the statements made in the telephone solicitations and mass mailings are not identified and the plaintiff has failed to provide any evidence as to what these statements actually were, such allegations must fail. However, as to the statements published in Exhibits 1 and 2, these will be addressed by the Court.
Exhibit 1 is a handbill which is entitled "Are the Scales of Justice Balanced?", and which states "It is the opinion of an alliance of Beverly Hills citizens that the employees of Beverly Hills Foodland are being treated unfairly at their jobs. Before you do your shopping ask yourself and Beverly Hills Foodland these questions." The questions are as follows:
1. Is Beverly Hills Foodland being discriminatory in their hiring practices in the community?
2. How many of Beverly Hills Foodland's management team live within the community?

*705 3. How many of Beverly Hills Foodland's management team are of the Community's minority class?
4. How many full-time minority class people does Beverly Hills Foodland employ?
5. How many minority class full-time employees of Beverly Hills Foodland were hired from your Community?
6. Is the money you spend grocery shopping at Beverly Hills Foodland being reinvested and staying within the Community?
7. Why did a recent survey show that Beverly Hills Foodland is charging more for its groceries than National Supermarket at 91 North Oaks Plaza, especially since Beverly Hills Foodland is paying its employees less than the employees at National Supermarkets?
8. Do you want to undermine the area wage standards established in the area for the Food Industry by shopping at Beverly Hills Foodland?
These questions are then followed by the statement "For answers to these questions call 381-1122." (Foodland's telephone number). At the bottom of the handbill is the statement "PLEASE DO NOT SHOP BEVERLY HILLS FOODLAND". Exhibit 2 is another handbill entitled "Don't Help Feed the Rat" and states in relevant part:
"Foodland is a RAT EMPLOYER who has hired workers to perform food industry work at substandard wages and fringe benefits.
In our opinion any employer whose greed compromise an employees right to fair treatment, a fair wage and benefits, deserves to be called a RAT."
Plaintiff's main contention is that the use of the terms "unfair" and "RAT" are false and defamatory. In its response to the summary judgment motion, Plaintiff provides no evidence, caselaw or otherwise, that such terms are statements of false fact or that the defendant made these statements with knowledge of their falsity or with reckless disregard for whether they were true or false.
The Supreme Court has already noted that terms such as "scab", "unfair" and "liar" are commonplace in labor disputes and their use has been routinely protected under the federal labor laws. Linn, 383 U.S. at 61, 86 S.Ct. at 662. As for the word "RAT", this Court cannot construe the word to be a representation of fact. No one could read the handbill and believe that the owner/manager of Foodland was actually a rodent animal. See, Letter Carriers v. Austin, 418 U.S. at 284-85, 94 S.Ct. at 2781-82 quoting, Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970). Rather the term, as explained in the handbill, was used in a "loose, figurative sense" to aptly describe the defendant's strong (negative) views of the plaintiff's employment practices. Expression of such an opinion, even by using the word "RAT" as an insult, is protected under federal labor laws. Letter Carriers v. Austin, 418 U.S. at 284, 94 S.Ct. at 2781.
With regard to the eight questions listed on Exhibit 1, these also cannot be construed as "statements of fact". Firstly, they are not statements at all, but rather invite the reader to make his/her own inquiry and assess the "facts" for him or herself. Secondly, the plaintiff has failed to provide any evidence that the questions were articulated with actual malice. The defendant, on the other hand, has provided the Court with a copy of Terrance LeGrand's deposition in which he point blank admits that no minority persons held management positions, that most (if not all) black employees worked part-time instead of full-time (the consequence of which was no fringe benefits), that all of the management personnel and most of the rank-and-file employees lived outside of Beverly Hills, and that Foodland's pay scale was lower than that at the nearby unionized grocery stores. Deposition of Terrance LeGrand, filed November 20, 1991; see also, Affidavit of Paul Laute, filed August 9, 1991. In fact, Mr. LeGrand admitted that none of the "factual statements" in Exhibit 1 were incorrect. Deposition of Terrance LeGrand, pg. 78. Thus, the genesis of these questions was grounded in truthful fact.
*706 Plaintiff also contends that the picket signs carried a statement to the effect that Foodland was "unfair to black employees". Plaintiff provides no evidence that such a statement was actually displayed on picket signs; however, assuming that such a statement did appear, the Court finds such a statement not to be defamatory and protected under the federal labor laws. As noted above, plaintiff has admitted that black employees were not given management positions, were not employed full-time (thus denied fringe benefits), and that all employees were paid less than the area union wages. As a statement of "fact", the Court finds no obvious falsehood. Furthermore, the statement really is not one of "fact" but rather is an expression of the defendant's opinion; its expressed displeasure at the plaintiff's admitted employment practices. Consequently, Counts I, IV, VI, and IX must fail as a matter of law.
As to the price survey handbill, plaintiff has failed to provide any evidence that the statement that Foodland's prices were 9% higher than a nearby National foodstore was made with actual malice. Plaintiff's only evidence to contradict the price survey is Terrance LeGrand's affidavit, filed September 17, 1991, in which he claims a price survey done by his personnel showed that prices at Foodland were lower than at the National foodstore. However, at his deposition, he admitted that he had no personal knowledge of the items purchased, and further conceded that Foodland's price survey cash register receipts showed that identical items were not purchased from the two stores. Deposition of Terrance LeGrand, pgs. 56-69. Defendant has submitted copies of the cash register receipts, supporting its price survey handbill, which show a 9% difference in prices. Mr. LeGrand admitted that these receipts do show that identical items were purchased from the two stores. Deposition of Terrance LeGrand, supra, Supplemental Affidavit of Patrick McDonough, filed September 26, 1991.
In Counts II and VII, plaintiff appears to be claiming that the statements noted above tortiously interfered with its business relationships with a substantial number of customers. In support of this claim, plaintiff refers to a deposition of Patrick McDonough in which he "specifically admitted that the purpose of providing information (information that was false) was to organize the union or put Foodland out of business." Plaintiff has not provided the Court with Mr. McDonough's deposition, either in whole or in part, and fails to even cite to the page in his deposition wherein he made such a statement. In sum, plaintiff has provided no evidence, whatsoever, that the picketing by the defendant was anything other than informational.
Plaintiff's state law claim for tortious interference must fail because the defendant's activities (as listed by plaintiff in Count I of the second amended complaint) are constitutionally protected. Informational and "area standards" picketing and non-violent boycotts against the primary employer are First Amendment activities protected under the federal labor laws. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1981); Electrical Workers v. Labor Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1960); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1939); Barss v. Tosches, supra.; N.L.R.B. v. Sheet Metal Workers Union Local 3, 662 F.2d 513 (8th Cir.1981); N.L.R.B. v. Int'l Brotherhood of Electrical Workers, Local 265, 604 F.2d 1091 (8th Cir.1979); NLRA, 29 U.S.C. § 158(b)(7)(C). As early as 1939, the Supreme Court has accorded constitutional protection to peaceful picketing of a primary employer even if "the purpose of the described activity was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." Thornhill v. Alabama, 310 U.S. at 99, 60 S.Ct. at 742 citing, O'Rourke v. Birmingham, 27 Ala.App. 133, 168 So. 206, cert den., 232 Ala. 355, 168 So. 209.
In Counts III, V, VIII, and X plaintiff claims that defendant's business representative and agent Pat McDonough, as well as unnamed picketers, referred to the owner(s) of Beverly Hills Foodland as "racist". *707 Defendant does not deny that statements were made in which the owner(s) of Foodland were referred to as "racist"; however, it insists that this term is not defamatory because "regardless of its generally negative connotations; it is a term which, like `facist' or `communist', has been bandied about with such frequency that it is devoid of any specific meaning." Defendant's Reply Memorandum, pg. 11. It further contends that actual malice cannot be shown with the alleged accusation of racism because racial disparities in Foodland's employment practices did exist.
Unlike the words "unfair" and "scab", this Court does not agree that the word "racist", even when used in the context of a labor dispute, is nondefamatory as a matter of law. Although the Supreme Court found Jack London's literary definition of "scab" protected under the federal labor laws, it did acknowledge that "[t]his is not to say that there might not be situations where the use of this writing or other similar rhetoric in a labor dispute could be actionable, particularly if some of its words were taken out of context and used in such a way as to convey a false representation of fact." Letter Carriers v. Austin, 418 U.S. at 286, 94 S.Ct. at 2782. This Court submits that such a situation existed with regard to the defendant's use of the word "racist".
"Racism" or "racist" is defined as 1) a belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race; or 2) racial prejudice or discrimination. Webster's Ninth New Collegiate Dictionary (1984). One of the generally accepted definitions of "prejudice" is "an irrational attitude of hostility directed against an individual, a group, a race, or their supposed characteristics." Id. Essentially, the defendant argues that by virtue of the "fact" that minorities were underrepresented in management positions and in full-time employment positions, racial discrimination could be "inferred" thereby justifying its accusation of racism. Given the accepted definition of racism and prejudice, the Court believes that such an argument presents an issue of fact for a jury to decide; i.e. whether the word "racist" was used in such a way to convey a false representation of fact. Letter Carriers v. Austin, 418 U.S. at 286, 94 S.Ct. at 2782.
Furthermore, if a jury should decide that the defendant's accusations of racism do not deserve the protection of the federal labor laws, it then becomes a question for the jury as to whether or not the use of the word "racist" was defamatory. Defendant concedes that the Missouri Supreme Court has opined that the defamatory nature of certain words or language is determined, in part, by the "temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place." Lightfoot v. Jennings, 363 Mo. 878, 254 S.W.2d 596, 599 quoting, Mencher v. Chesley, 297 N.Y. 94, 100, 75 N.E.2d 257, 259. However, defendant believes that its cited case-law from outside of Missouri decisively determines that accusations of racism are not defamatory. The Court wholeheartedly disagrees.
The Court believes that under Missouri law, a jury should decide the defamatory nature of words based upon, including but not limited to, the context in which they are used, the social and political climate of the times, and the social and political makeup of the local community. In light of the recent racial disturbances in Los Angeles, the alleged racial polarization in St. Louis, and the fact that these accusations were made in a predominantly Afro-American community, this Court cannot say, as a matter of law, that a jury would find the use of the word "racist" to be devoid of specific meaning or rendered meaningless by overuse, therefore not defamatory, as the defendant contends. Consequently, the Court finds that material issues of fact do exist as to whether or not the defendant's accusations of racism were made with actual malice; and if so, whether they were defamatory in nature. Summary judgment will be granted as to Counts III and V, but not as to Counts VIII and X.[4]

*708 ORDER

In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that the defendant's motion for summary judgment (# 27), filed June 11, 1993 and renewed on September 9, 1993, be and is GRANTED in part and DENIED in part. Judgment is entered for the defendant and against the plaintiff on Counts I, II, III, IV, V, VI, VII, and IX only of the Second Amended Complaint. Counts VIII and X remain to be tried before a jury on December 27, 1993.
NOTES
[1] The parties consistently refer to documents previously filed in connection with summary judgment motions and motions to dismiss filed by the defendant in 1991. These motions have been ruled upon by Judge Cahill and this Court. However, the Court will consider the documents attached to these earlier motions in its consideration of the present motion.
[2] Copies of these two documents have been repeatedly filed as attachments to various pleadings. Most recently, they have been filed as an attachment to the second amended complaint as Exhibits 1 and 2. Exhibit 1 is the flyer with eight questions for shoppers to ask of Foodland and is entitled "Are the Scales of Justice Balanced?". Exhibit 2 refers to the plaintiff as a "rat" and is entitled "Don't Help Feed the Rat". The flyer informing the public of the price survey was not attached to the second amended complaint; however, a copy of it was attached to the plaintiff's response to the defendant's motion to dismiss and motion to strike, filed August 29, 1991.
[3] Although the Court refers to the defendant's activities during the relevant time period in a collective sense, it is clear that the plaintiff's claims do not include an allegation that the picketing, in and of itself, was defamatory or tortiously interfered with the plaintiff's business. Rather, the plaintiff's claims regard only the terms used, the statements made, and the messages published during the pickets.
[4] Summary judgment is granted for the defendant as to Counts III and V because the Linn standard is applicable to this case and these counts fail to allege actual malice.