[No. C054400. Third Dist. July 21, 2010.]

SUTTER HEALTH et al., Plaintiffs and Appellants, v.
UNITE HERE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication
with the exception of parts II through V.

1194

## COUNSEL

O'Melveny & Myers, Robert C. Welsh, Sarah A. Stofferahn; Jones Day, F. Curt Kirschner, Jr., and Christopher T. Scanlan for Plaintiffs and Appellants.

Altshuler Berzon, Michael Rubin, Scott A. Kronland and Stacey Leyton for Defendant and Appellant.

Levy, Ram & Olson, Karl Olson, Erica L. Craven; Thomas W. Newton; Stephen J. Burns; Karlene W. Goller; Jonathan R. Donnellan, Kristina E. Findikyan; Judith L. Fanshaw; and Margaret C. Crosby for California

Newspaper Publishers Association, McClatchy Newspapers, Inc., McClatchy Company, Los Angeles Times Communications LLC, Hearst Corporation, The Associated Press, Copley Press, Inc., American Civil Liberties Union of Northern California and California First Amendment Coalition as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**SCOTLAND, P. J.**—In an effort to force a nationwide laundry company to employ only union members and to improve their working conditions, a labor union commenced a campaign utilizing a variation of a technique known as secondary picketing. The campaign was directed at a group of hospitals that used the services of the laundry company. The union mailed postcards to prospective clients of the hospitals, warning them that the hospitals had their laundry cleaned by a company that did not ensure the cleaned linens would be free of blood, feces, and other harmful pathogens. The postcards were intended to (1) dissuade people from using the hospitals because of the laundry company's shortcomings, thus (2) put pressure on the hospitals to stop using the laundry company's services, which would (3) persuade the laundry company to agree to the union's demands in order to avoid the loss of the hospitals' business.

The hospitals fought back. Armed with evidence that their inspection control and linen handling policies ensured the delivery of hygienically clean laundry to all their patients, but that the union's postcard campaign had caused fewer patients to use the hospitals, the hospitals sued the union for defamation, trade libel, and intentional interference with prospective economic relations.

The union appeals from the $17 million judgment entered after a jury found in favor of the hospitals.

We agree with the union that the court committed harmful error by refusing to instruct the jury that the hospitals had the burden of proving by clear and convincing evidence that the union made the defamatory publication with actual malice, i.e., with knowledge of its falsity or with reckless disregard of whether it was true or false.

As we will explain, binding federal law holds that this actual malice burden of proof applies to plaintiffs who seek state remedies for defamatory labor dispute publications, and that such publications include those directed at "secondary targets," i.e., companies using the services of a company that is engaged in a labor dispute with an employee union. The postcard publication

in this case was such a labor dispute communication because the union used it to advance the union's primary dispute with the laundry company by exerting pressure on the hospitals to stop using the laundry's services if the labor dispute was not resolved. Instead of giving the required actual malice instruction, the trial court told the jury that the union could be liable if it failed to use reasonable care to determine the truth or falsity of the publication. This was harmful error because the instruction omitted a vital element of the case and misinformed the jury regarding the hospital's burden of proof.

Accordingly, we shall reverse the judgment. In the unpublished parts of this opinion, we will address some of the union's other claims of error for guidance to the trial court on remand.

## FACTS

This case has its genesis in a labor dispute between UNITE HERE and Angelica Textile Services, Inc. (Angelica). UNITE HERE, a labor union, is the collective bargaining representative for about 450,000 workers employed in the garment industry, industrial laundries, and food service establishments across North America. Angelica is the largest healthcare laundry company in the United States, with approximately 31 laundry facilities nationwide.

By early 2005, UNITE HERE represented over 2,500 workers at approximately 21 Angelica facilities, including workers at the laundry facilities used by Sutter Health hospitals (collectively Sutter Health).

UNITE HERE had begun a nationwide campaign in 2003 to organize the workers at all of Angelica's commercial laundry facilities. Healthcare laundries were a big priority because, according to UNITE HERE, such workers face some of the worst and most hazardous working conditions. The "Angelica campaign" was designed to improve the working conditions and strengthen the union in the shops where UNITE HERE represented workers employed by Angelica, and to bring those protections to workers in unorganized shops.

UNITE HERE began investigating Angelica's physical facilities and their compliance with health and safety regulations. The union had received complaints from workers that, because of unsanitary conditions and inadequate separation between "clean" and "soiled" areas of the laundry, clean linens were being exposed to blood, feces, human tissue, and other hazards. According to the union, Angelica was not regularly disinfecting work areas and was not providing hepatitis B vaccines and training on blood-borne pathogens to workers in the laundry area. UNITE HERE members visited a number of Angelica shops to see if such unsanitary conditions were unique to

a few shops or part of a larger pattern. Similar conditions were observed at all of the shops. Indeed, the Occupational Safety and Health Administration (OSHA) cited Angelica for putting clean linen in dirty carts, not providing workers with protective equipment, and having working conditions that caused workers to step in blood and feces.

UNITE HERE wrote to Angelica to complain about the company's non-compliance with OSHA's blood-borne-pathogen standards, urging it to remedy the sanitation and housekeeping problems in its soiled linen departments. Angelica did not respond.

Sutter Health used laundry facilities owned and operated by Golden State Services, Inc.—facilities which Angelica acquired in December 2004. The laundry workers had a bargaining agreement with UNITE HERE that remained in effect until December 2006.

In May 2004, UNITE HERE prepared a report, "Compromising on Quality," which presented evidence that Angelica's failure to maintain a sanitary workplace "leads to the delivery of soiled, smeared, and smelly linens" to hospitals. The report (1) summarized the results of UNITE HERE's "systematic investigation of the working conditions and quality control throughout Angelica's nation-wide system of healthcare laundries," and (2) incorporated the results of interviews with hundreds of Angelica workers across the country, people from each stage of the production process, and hospital materials management personnel. For example, an employee reported receiving "clean" linens with clots of blood or feces. Hospitals reported that, with varying degrees of frequency, Angelica delivered linens that were "smeared, stained, tattered, damp, foul-smelling, and torn." A materials management employee at an Angelica client hospital reported that linen delivered by Angelica smelled "like urine and BM." The report stated that Angelica's practices violated OSHA's requirements, as well as those of the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

UNITE HERE sent its "Compromising on Quality" report to many of Angelica's customers, including Sutter Health. The union also wrote to Sutter Health's vice-president for procurement about Angelica's problems; advised Sutter Health of the labor dispute; warned that, if it continued to do business with Angelica, Sutter Health could face service interruptions; and suggested that Sutter Health meet with representatives of UNITE HERE.

A few months after Angelica acquired the laundry facilities used by Sutter Health, UNITE HERE began escalating its campaign to organize all of the Angelica workers nationwide. According to UNITE HERE, Angelica had not been responsive to the union's health and safety concerns, and the hospitals

had not contacted UNITE HERE. The only response from one medical center was to ask the union to stop leafleting in front of its hospital. UNITE HERE, which had hoped to avoid a strike, began planning one for May 2005 at Angelica facilities in New York, Kansas, Texas, North Carolina, Florida, and some facilities in Southern California.

Meanwhile, around late March 2005, UNITE HERE mailed numerous postcards (1) warning that Angelica, the laundry service used by Sutter Health, did not ensure its linens were free of harmful pathogens, and (2) urging potential Sutter Health patients to protect their newborns because Sutter Health may not be taking sufficient precautions against potential infections.

One side of the postcard stated: "EXPECTING? [¶] You may be bringing home more than your baby if you deliver at a Sutter birthing center." The other side said: "You will do *anything* to protect your vulnerable newborn from infection—but your Sutter birthing center may not be taking the same precautions. Reports have surfaced that Angelica, the laundry service utilized by Sutter, does not ensure that 'clean' linens are free of blood, feces, and harmful pathogens. [¶] *Protect your newborn.* [¶] Choose your birthing center wisely. [¶] www.thedirtylaundry.org [¶] UNITE HERE is engaged in a labor dispute with Angelica Textile Services."

The Web site noted on the postcard contained information about the working conditions at Angelica facilities and included a copy of the "Compromising on Quality" report.

The text of the postcard was the collaborative effort of UNITE HERE's research coordinator, Connie Razza, UNITE HERE's director of communications, Anastasia Ordonez, and another UNITE HERE employee, Cristina Gallo.

Razza devised the "Sutter Escalation Plan," which involved mailing the postcard to prospective clients of birthing centers at Sutter Health hospitals. The target audience was "wealthier women between 25 and 40 who are registered to vote." The focus of the campaign was on Sutter Health because the creators of the postcard were trying to think "critically" about Angelica's large corporate customers, and Sutter Health had become a significant customer a few months earlier. The purpose was to dissuade individuals from doing business with Sutter Health's affiliates unless Sutter Health stopped doing business with Angelica. Angelica had refused to listen to the union's complaints, and UNITE HERE thought that, if the union reached people whose interests were also affected by the conditions in these workplaces, then the workers' voices might be heard by Angelica.

In June 2005, a few months after the postcard was mailed, UNITE HERE and Angelica entered into an organizing rights agreement under which UNITE HERE obtained the right to organize all of the remaining Angelica workers.

Meanwhile, in April 2005, Sutter Health sued UNITE HERE for defamation, trade libel, and intentional interference with prospective economic relations (IIPER), based on the publication of the postcard.[1]

Sutter Health presented evidence that it experienced negative effects from UNITE HERE's campaign. For example, public opinion surveys conducted by Sutter Health on a regular basis revealed that the percentage of women aged 25 to 39 who disagreed with the statement that Sutter Health offers high-quality healthcare doubled after the postcard was mailed. Other evidence indicated that fewer women chose Sutter Health facilities as a birthing option. A field survey of the postcard recipients on UNITE HERE's mailing list, which survey replicated the postcard but used a fictitious "XYZ" hospital name in place of Sutter Health, indicated the message on the postcard negatively affected the recipients' willingness to use or recommend the fictitious hospital.

Sutter Health also presented testimony from a representative group of its infection control practitioners, nurses, and linen managers who described their infection control practices and testified those practices ensured that Sutter Health provided patients with clean, safe linen. In addition, Dr. William Rutala, an expert in infection control and healthcare practices, reviewed Sutter Health's written infection control and linen handling policies and the inspection reports documenting Sutter Health's inspections of the three laundry facilities it uses. Dr. Rutala testified Sutter Health hospitals take reasonable and appropriate precautions to ensure that hygienically clean linen is delivered to all patients; indeed, Sutter Health voluntarily created and implemented practices for linen sanitation that included several extra and redundant layers of protection going above and beyond what is required by California law and infection control guidelines.

---

[1] UNITE HERE's methodology might be construed as an unlawful labor practice, but Sutter Health chose not to pursue recourse on this ground. (See 29 U.S.C. §§ 158(b), 187(a); *Intercity Maintenance Co. v. Local 254* (1st Cir. 2001) 241 F.3d 82, 87 [indirect efforts to pressure a secondary employer are unfair labor practices].) This was pointed out by the United States District Court when it rejected UNITE HERE's attempt to remove the action to federal court. The district court observed that Sutter Health likely could have raised a federal question by alleging an unfair labor practice claim, but it chose not to avail itself of that remedy—instead pursuing state law remedies in its quarrel with UNITE HERE, which the federal district court referred to as a labor dispute. (*Sutter Health v. UNITE HERE* (E.D.Cal., Aug. 10, 2005, No. 2:05-CV-1081 MCEPAN) 2005 WL 1925910.)

UNITE HERE representatives were not aware or did not know if anyone had ever acquired an infection from linen laundered by Angelica and used by Sutter Health. And the union knew nothing about Sutter Health's infection control procedures. However, Razza, the union's research coordinator, testified that in early March 2005, she had a series of meetings with Sutter Health employees who told her about Sutter Health's linen quality and infection control problems. According to Razza, at least one woman from Sutter Health's environmental services department told her the linen received from Angelica "was really gross" and "c[a]me[] with stains and materials on it that is like human excrement and things like that."

David Unger, an organizer in UNITE HERE's healthcare laundry division, testified he met with Angelica workers at many facilities, including those used by Sutter Health, and he observed many health and safety problems. He passed the information on to Razza and Gallo.

Belinda Thielen, the senior health and safety officer for UNITE HERE, testified she honestly believed that Angelica did not ensure its linens were free of pathogens. This belief was based on her research, what she learned at various Angelica facilities, and what her coworkers assigned to other Angelica facilities observed about unsanitary working conditions. Thielen interviewed workers from six California facilities, plus facilities in four other states, and she inspected several facilities in California. She observed many unsafe practices, including a lack of protective equipment for workers, a lack of soap and hot water in the bathrooms, workers standing on what appeared to be smears of blood and feces on flooring that could not be decontaminated easily, traffic patterns between the soiled linen areas and clean linen areas that did not appear to be properly controlled, and carts that appeared to have soil on them from hospital linen. Thielen learned that workers assigned to the clean side of the plant were finding contaminants such as blood and feces they felt presented a hazard to them. However, these reported incidents did not involve Angelica facilities that laundered Sutter Health's linens.

Thielen further testified she consulted with Dr. John Rosenberg, a public health physician, to determine whether linen that appeared to have been improperly cleaned at Angelica facilities could present a risk to people receiving the linen. Dr. Rosenberg explained there could be a problem for people with suppressed immune systems. Thielen believed that this would apply to babies because they have undeveloped immune systems. Thielen also conducted a search of medical literature and found that microbes can survive and grow on linens, that linens can be recontaminated after cleaning, and that there is documentation linking illness or infection with exposure to contaminated linens.

According to Thielen, she had no reason to doubt, and she was confident in, the information upon which she relied for the postcard. She knew that Angelica as a corporation had consistent practices throughout all of the plants with which UNITE HERE was familiar.

Sutter Health argued UNITE HERE's postcard was defamatory and damaged Sutter Health's prospective economic prospects because it falsely indicated that Sutter Health did not use clean sheets or adequately care for the safety of infants born at Sutter Health hospitals.

The jury found UNITE HERE liable to 12 of the 14 Sutter Health plaintiffs on the defamation and IIPER causes of action, and awarded them between $81,825 and $2,618,000 in damages for defamation, plus identical amounts for IIPER. The jury found that another plaintiff was entitled to defamation damages but not IIPER damages. The jury did not award the Sutter Health plaintiffs any damages for trade libel. The jury found the defamation and IIPER torts were committed with malice, fraud, or oppression but did not award any punitive damages. The total award plus costs exceeded $17 million.

## DISCUSSION

### I

UNITE HERE contends the trial court erred in refusing to give a proposed instruction that would have told jurors that, in order to find UNITE HERE liable for defamation, the Sutter Health plaintiffs "must prove by clear and convincing evidence that UNITE HERE knew the statements were false or had serious doubts about the truth of the statements."[2]

---

[2] When UNITE HERE's counsel asked if the rejection of the proposed instruction was a ruling "that this is not a labor dispute," the court replied: "I made a ruling that your proposed jury instruction is not applicable to the facts given the law." Instead, as to the cause of action for defamation, the court instructed, in pertinent part, that to establish this claim, Sutter Health must prove "UNITE HERE failed to use reasonable care to determine the truth or falsity of the statement(s)." As to the cause of action for trade libel, the court instructed, in pertinent part, that Sutter Health must prove "UNITE HERE published the statement with malice, express or implied." The court then told the jurors this malice requirement is satisfied if they find "any one of the following to be true: [¶] 1. That UNITE HERE's state of mind was characterized by actual hatred, spite, or ill will; [¶] 2. That UNITE HERE published a false statement despite lacking reasonable grounds to believe it to be true or displayed a reckless disregard for the truth or falsity of the statement; or [¶] 3. That malice may be implied from UNITE HERE's wrongful activities. For example, if you conclude that UNITE HERE knew that the statement was false at the time it published it, th[at] UNITE HERE made the statement with the intent to deceive, or that other facts and circumstances demonstrate a malicious state of mind, no further evidence of malice is necessary."

The proposed instruction was based on *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710] (hereafter *New York Times*), which held that a public official or public figure plaintiff seeking damages for defamatory statements must prove by clear and convincing evidence that the defendant acted with actual malice, i.e., the defendant made the defamatory statement with knowledge of its falsity or with reckless disregard of whether it was true or false. (*Id.* at pp. 279–280 [11 L.Ed.2d at pp. 706–707]; see also *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 342–343 [41 L.Ed.2d 789, 807, 94 S.Ct. 2997].) Such reckless disregard is a subjective standard that is measured by whether " 'the defendant in fact entertained serious doubts as to the truth of [its] publication,' " not by whether a reasonably prudent person would have published the statement or would have investigated before publishing it. (*Harte-Hanks Communications Inc. v. Connaughton* (1989) 491 U.S. 657, 688 [105 L.Ed.2d 562, 589, 109 S.Ct. 2678]; see *St. Amant v. Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].)

UNITE HERE claims that Sutter Health is a public figure, thus the *New York Times* actual malice standard applies. Alternatively, the union contends that, even if Sutter Health is not a public figure, the actual malice standard applies because UNITE HERE's publication was made during a labor dispute.

■ For reasons that follow, we conclude the requested actual malice instructions should have been given because the publication was a labor dispute communication. Therefore, we need not decide whether Sutter Health is a public figure.

## A

■ "Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." (*Linn v. Plant Guard Workers* (1966) 383 U.S. 53, 58 [15 L.Ed.2d 582, 587, 86 S.Ct. 657] (hereafter *Linn*).)

Thus, in *Linn*, the United States Supreme Court found it was "necessary to determine whether libel actions in such circumstances might interfere with the national labor policy" contained in the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.). (*Linn, supra*, 383 U.S. at p. 58 [15 L.Ed.2d at p. 587].) The "resolution [of that question] entails accommodation of the

federal interest in uniform regulation of labor relations with the traditional concern and responsibility of the State to protect its citizens against defamatory attacks." (*Id.* at pp. 57–58 [15 L.Ed.2d at p. 587].)

 The court "acknowledge[d] that the enactment of § 8(c) [of the NLRA] manifests a congressional intent to encourage free debate on issues dividing labor and management" (*Linn, supra,* 383 U.S. at p. 62 [15 L.Ed.2d at p. 589]) and that the National Labor Relations Board leaves " 'to opposing parties the task of correcting inaccurate and untruthful statements.' [Citation.]" (*Id.* at p. 60 [15 L.Ed.2d at p. 588].) The court noted, however, that, while "tolerat[ing] intemperate, abusive and inaccurate statements made by [a] union during attempts to organize employees," the National Labor Relations Board "does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false." (*Id.* at p. 61 [15 L.Ed.2d at p. 589].)

Accordingly, the Supreme Court held the exercise of state jurisdiction over defamatory statements in labor disputes is not inconsistent with the NLRA "provided [that state jurisdiction] is limited to redressing libel issued with knowledge of its falsity, or with reckless disregard of whether it was true or false." (*Linn, supra,* 383 U.S. at p. 61 [15 L.Ed.2d at p. 589].) Stated another way, "the availability of state remedies for libel" in labor disputes is limited "to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." (*Id.* at pp. 64–65 [15 L.Ed.2d at p. 591].)

Consequently, in the context of labor disputes, the court held that, to trigger the "actual malice" requirements of *New York Times,* the plaintiff need not be a public figure. (*Linn, supra,* 383 U.S. at pp. 64–65 [15 L.Ed.2d at p. 591].)

 Moreover, "any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of *Linn,*" even if it is not made during a representation election campaign, and regardless of whether the publication concerns efforts leading to recognition or postrecognition organizing activity. (*Letter Carriers v. Austin* (1974) 418 U.S. 264, 279 [41 L.Ed.2d 745, 759, 94 S.Ct. 2770] (hereafter *Austin*).)

Thus, libel and slander actions in state court may be brought within the context of a labor dispute only if the defamatory publication is shown by clear and convincing evidence to have been made with knowledge of its falsity, or with reckless disregard of whether it was true or not. (*Austin, supra,* 418 U.S. at p. 281 [41 L.Ed.2d at p. 760]; *Ruzicka Electric & Sons v. International Brotherhood* (8th Cir. 2005) 427 F.3d 511, 523.)

B

UNITE HERE asserts that its postcard publication was a labor dispute communication because it was made during union organizing efforts and was a means to cause Sutter Health to pressure Angelica to improve unsanitary workplace conditions and to organize all of its laundry establishments. (See, e.g., *Metropolitan Opera Assn., Inc. v. Local 100* (2d Cir. 2001) 239 F.3d 172, 173–174, 177 [union's actions of seeking to assert social pressure on opera association in connection with labor dispute between union and association's food service provider, by warning of "repercussions" against those who did not join its boycott of opera association, including such repercussions as leafleting condemning an association donor for refusing to join, constituted protected speech under 1st Amend. notwithstanding that actions might have been harassing, upsetting, or coercive].)

Controlling federal law supports UNITE HERE's contention.

■ Whether a labor dispute exists within the meaning of the NLRA is a question of law. (*Hasbrouck v. Sheet Metal Workers Local 232* (9th Cir. 1978) 586 F.2d 691, 694.) The NLRA defines a "labor dispute" as "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." (29 U.S.C. § 152(9).)

"As the statutory definition clearly states, the existence of a labor dispute does not depend upon the existence of an employer-employee relationship. As long as the union acts for some job-related reason in order to exert economic pressure, the conflict constitutes a labor dispute. 'Rarely have courts found concerted union activities to fall outside this broad definition. Where the union acts for some arguably job-related reason, and not out of pure social or political concerns, a "labor dispute" exists.' [Citations.]" *(Beverly Hills Foodland v. United Food Workers* (E.D.Mo. 1993) 840 F.Supp. 697, 702 (hereafter *Beverly Hills Foodland*).)

Thus, the partial preemption of state libel remedies "cannot depend on some abstract notion of what constitutes a 'labor dispute' . . . [but] must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." (*Austin, supra,* 418 U.S. at p. 279 [41 L.Ed.2d at pp. 758–759].) "Unions have a legitimate and substantial interest in continuing organizational efforts after recognition. Whether the goal is merely to strengthen or preserve the union's majority, or is to achieve 100% employee

membership . . . these organizing efforts are equally entitled to the protection of [the NLRA]." (*Id.* at p. 279 [41 L.Ed.2d at p. 759], fn. omitted.) Indeed, courts have routinely found that, within the context of the NLRA, a "labor dispute" "exists in situations which do not involve any organizing activities by a union." (*Beverly Hills Foodland, supra,* 840 F.Supp. at p. 702.)

Accordingly, it does not matter that UNITE HERE's primary labor dispute was with Angelica and only secondarily with Sutter Health. (*Overstreet v. United Brotherhood of Carpenters* (9th Cir. 2005) 409 F.3d 1199 (hereafter *Overstreet*).)

■ *Overstreet* explains: "Disputes, labor and otherwise, commonly spill over to affect secondary institutions, as individuals with strong opinions concerning the dispute seek to convince those with some prospect of influencing the outcome of the dispute to do so. Clothing manufacturers allegedly operate sweatshops, and activists protest institutions that buy clothing from those manufacturers. [Citation.] A nation takes controversial political or military actions, and activists pressure universities and other institutions to divest endowment or other funds from businesses supporting those actions. [Citation.] [¶] Whatever one might think about the merits of these disputes, all parties involved understand that a dispute does exist between activists and the 'secondary' institutions. There is likely to be disagreement, true, over whether the secondary is contributing to the primary's actions in any significant way, or whether the primary's actions are objectionable at all. But any such disagreement does not affect whether, in common parlance, a 'dispute' exists concerning maintaining ties with an individual or institution taking controversial action. And, when the specific dispute is whether the secondary institution should sever ties with another company so that the secondary institution does not undermine regional labor standards, 'labor dispute' is a perfectly apt description." (*Overstreet, supra,* 409 F.3d at pp. 1216–1217; see also *Burlington No. R. Co. v. Maintenance Employees* (1987) 481 U.S. 429 [95 L.Ed.2d 381, 107 S.Ct. 1841] [refused to exclude secondary picketing activity from the Norris-LaGuardia Act definition of a labor dispute (29 U.S.C. § 113(c)), which is virtually identical to the NLRA definition of a labor dispute (29 U.S.C. § 152(9))].)

Here, UNITE HERE sought to advance its primary dispute with Angelica by exerting pressure on Sutter Health. It intended the postcard to cause potential patients to question Sutter Health's use of Angelica and to raise the specter that the patients would boycott using Sutter Health for the birth of their children. In this manner, UNITE HERE hoped to cause Sutter Health to

pressure Angelica to improve the working conditions of its employees and to unionize all of Angelica's facilities.[3]

The postcard communication was thus part of a labor dispute, just as was the publication in *San Antonio Hospital v. Southern California Council of Carpenters* (9th Cir. 1997) 125 F.3d 1230 (hereafter *San Antonio Hosp.*), in which a carpenters' union engaged in a labor dispute with a construction subcontractor hired by the hospital displayed a banner stating, " 'THIS MEDICAL FACILITY IS FULL OF RATS.' " (*Id.* at pp. 1232–1233.)[4]

Consequently, Sutter Health had to meet the standard "commonly known as the *New York Times* 'actual malice' standard." (*San Antonio Hosp., supra,* 125 F.3d at p. 1235.) In other words, Sutter Health was required to prove by clear and convincing evidence that UNITE HERE published the offending statement in the postcard with actual malice, i.e., with knowledge of its falsity, or with reckless disregard of whether it was true or false.

Because the trial court declined to give UNITE HERE's proposed actual malice jury instruction, Sutter Health was not put to its burden of proof on that element. This was error.

## C

Sutter Health contends that UNITE HERE's statements were not protected by federal labor law because they did not refer to labor grievances about employees' wages, hours, or conditions of employment. (Citing *Labor Board v. Electrical Workers* (1953) 346 U.S. 464 [98 L.Ed. 195, 74 S.Ct. 172]; *St. Luke's Episcopal-Presbyterian Hospitals v. National Labor Relations Bd.* (8th Cir. 2001) 268 F.3d 575, 579; *Five Star Transportation, Inc.* (2007) 349 NLRB 42.)

However, the decisions upon which Sutter Health relies for the aforesaid proposition are inapposite because they were not actions for defamation and thus did not address whether defamatory statements were made during a labor

---

[3] Hence, when UNITE HERE unsuccessfully sought to remove the action to federal court, the district judge observed that the matter could "technically be called a labor dispute." (See fn. 1, *ante.*)

[4] Applying the decisions in *Austin, supra,* 418 U.S. 264 [41 L.Ed.2d 745], *Linn, supra,* 383 U.S. 53 [15 L.Ed.2d 582], and *New York Times, supra,* 376 U.S. 254 [11 L.Ed.2d 686], *San Antonio Hosp.* found there was "a reasonable probability" that the hospital could prove " 'actual malice' " at trial because the " 'full of rats' " statement could be found to have been fraudulent because it indicated that the hospital had a rodent problem, and a layperson would not understand that the reference was a pejorative reference to the subcontractor. (*San Antonio Hosp., supra,* 125 F.3d at pp. 1236–1237.)

Sutter Health's efforts to distinguish *San Antonio Hosp.* are not persuasive.

dispute, such that the *Linn* actual malice standard applies. Rather, they concerned when an employer can discharge an employee for disloyal statements, and when it cannot because the statements are considered protected activity. (29 U.S.C. §§ 157, 158.)

The decisions simply held an *employee's* disparaging comments about an employer, which are unrelated to employment conditions, are not a protected activity under section 7 of the NLRA, and the employer's termination of the employee for making such comments is not an unfair labor practice under section 8 of the NLRA. They do not support Sutter Health's suggestion that similarly disparaging comments by a *union* concerning a secondary employer during the course of a labor dispute are not subject to the *Linn* actual malice standard if the comments do not explicitly address wages, hours, or working conditions.

As demonstrated by the decision in *San Antonio Hosp., supra*, 125 F.3d 1230, the actual malice standard applies to communications in furtherance of a labor dispute, even if the communications do not refer to wages, hours, or working conditions.

### D

Having determined that the trial court erred in refusing to give the requested actual malice instruction, we must decide whether the error was prejudicial.

■ "The standard of actual malice is a daunting one" (*McFarlane v. Esquire Magazine* (D.C. Cir. 1996) 316 U.S. App.D.C. 35 [74 F.3d 1296, 1308]) that focuses solely on the defendant's subjective state of mind at the time of publication (*Bose Corp. v. Consumers Union of U. S., Inc.* (1984) 466 U.S. 485, 512 [80 L.Ed.2d 502, 524, 104 S.Ct. 1949]). The plaintiff must prove that the defendant was actually aware the contested publication was false or that the defendant made the publication with reckless disregard of whether it was true or false. (*Linn, supra*, 383 U.S. at p. 61 [15 L.Ed.2d at p. 589]; *New York Times, supra*, 376 U.S. at pp. 279–280 [11 L.Ed.2d at p. 706].) Such reckless disregard means the defendant entertained serious doubts as to the truth of the publication, i.e., that the defendant had "a 'high degree of awareness'" of its "'probable falsity.'" (*Harte-Hanks Communications v. Connaughton, supra*, 491 U.S. at p. 688 [105 L.Ed.2d at p. 589]; *St. Amant v. Thompson, supra*, 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].) It is not measured by what a reasonably prudent person would have

published, or would have investigated before publishing. (*Harte-Hanks Communications v. Connaughton, supra,* 491 U.S. at p. 688 [105 L.Ed.2d at p. 589]; *St. Amant v. Thompson, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].) The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice. (*St. Amant v. Thompson, supra,* 390 U.S. at p. 733 [20 L.Ed.2d at p. 268].) "Mere negligence does not suffice" (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 510 [115 L.Ed.2d 447, 468, 111 S.Ct. 2419]), nor does "gross or even extreme negligence" (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 860 [231 Cal.Rptr. 518, 727 P.2d 711]).

Furthermore, the plaintiff must prove actual malice by "clear and convincing" evidence—a standard of proof that imposes a " 'heavy burden,' [citation], far in excess of the preponderance sufficient for most civil litigation." (*Eastwood v. National Enquirer, Inc.* (9th Cir. 1997) 123 F.3d 1249, 1252.) This standard requires the evidence of actual knowledge of the falsity of the statement, or reckless disregard for its falsity, must be of such a character "as to command the unhesitating assent of every reasonable mind." (*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 274 [105 Cal.Rptr.2d 674].)

Rather than give an actual malice instruction, the court told the jurors they could find UNITE HERE liable if Sutter Health proved by a preponderance of the evidence that the union failed to use reasonable care to determine the truth or falsity of the publication. This instruction omitted a vital element of the case and misinformed the jurors regarding Sutter Health's burden of proof.

Surely, " 'it seems probable' " that such a significant error " 'prejudicially affected the verdict.' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298]; accord, *Green v. State of California* (2007) 42 Cal.4th 254, 266 [64 Cal.Rptr.3d 390, 165 P.3d 118].)

Sutter Health disagrees, arguing the error is harmless because its attorney argued to the jury that UNITE HERE knew the publication was false; there is substantial evidence that UNITE HERE fabricated the publication about Sutter Health; and the jury's verdict on punitive damages—which required a finding of malice, fraud, or oppression (Civ. Code, § 3294; CACI No. 3946)—demonstrates that the jury necessarily found UNITE HERE acted with actual malice. We are not persuaded.

The instructions given by the court said Sutter Health could establish defamation by proving "UNITE HERE failed to use reasonable care to determine the truth or falsity of the statement(s)." Thus, Sutter Health counsel's argument that UNITE HERE knew the publication was false did not cure the instructional error that in effect told the jurors they could find the union liable for defamation even if UNITE HERE did not know the publication was false or did not have serious doubts about its truth.

Even if Sutter Health is correct in asserting that there is substantial evidence that UNITE HERE fabricated the implication regarding Sutter Health's poor sanitary conditions, this does not make the instructional error harmless. Whether UNITE HERE can be considered to have purposely avoided the truth and fabricated the publication, or whether it merely made a good faith reasonable inference based on the investigation it made and the scientific evidence available to it, is a question of fact for the jury; and we cannot say, as a matter of law, that UNITE HERE fabricated the publication.

The jury's verdict that UNITE HERE acted with "malice, fraud, or oppression" with respect to the issue of punitive damages is not the equivalent of a finding of "actual malice" necessary for a union to be liable for a defamatory publication made as part of a labor dispute. The court instructed the jury that "malice," as used in the phrase "malice, fraud, or oppression" for purposes of punitive damages, "means that UNITE HERE acted with intent to cause injury or that UNITE HERE's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences." Based on this instruction, the jury might have found that UNITE HERE's conduct satisfied the definition of malice simply because the statements in the postcard were made with the intent to injure Sutter Heath—which is not the same as acting with knowledge that the statements were false or with deliberate disregard for whether they were true or false.[5]

_____

[5] If the jury found that UNITE HERE acted with "oppression" or "fraud," neither finding is the equivalent to a finding of "actual malice" with respect to a defamatory publication made as part of a labor dispute. The trial court told the jury that "[o]ppression means that UNITE HERE's conduct was despicable and subjected [Sutter Health hospitals] to cruel and unjust hardship in knowing disregard of their rights. [¶] Despicable conduct is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people." If jurors were offended by UNITE HERE drawing Sutter Health into the union's labor dispute with Angelica, the jury might have believed UNITE HERE's conduct was oppressive within the meaning of the court's definition of oppression, even if the union did not know that the statements were false and did not act with deliberate disregard for whether they were true or false. "Fraud," the jury was told, "means that UNITE HERE intentionally misrepresented or concealed a material fact and did so intending to harm [Sutter Health]." We do not know

For the reasons stated above, Sutter Health has failed to show that the instructional error was harmless.

E

UNITE HERE argues that it is entitled to entry of judgment in its favor, as a matter of law, because Sutter Health cannot meet the burden of proof necessary to establish liability. We disagree.

 Whether there is sufficient evidence to permit a finding of actual malice is a question of law. (*Bose Corp. v. Consumers Union of U. S., Inc., supra*, 466 U.S. at pp. 510–511 [80 L.Ed.2d at p. 523].) The evidence could be interpreted as showing that, based on their research and investigation, UNITE HERE's employees had a good faith belief that the three main statements conveyed by the postcard were true: (1) reports surfaced that Angelica was not ensuring its laundered linens were free of harmful pathogens; (2) Sutter Health used Angelica's linens; and (3) this meant Sutter *might* not be doing everything it could to protect vulnerable newborns from infections, since UNITE HERE's research indicated that persons with compromised immune systems could be harmed by pathogens on improperly laundered sheets. On the other hand, Sutter Health presented evidence that (1) its infection control and linen handling policies and practices included extra and redundant layers of protection beyond what is required by California law and infection control guidelines; (2) its policies and practices ensured that hygienically clean and safe linen was delivered to all patients in Sutter Heath hospitals; and (3) UNITE HERE representatives had no evidence that any Sutter Health patient had ever been harmed by linens laundered by Angelica and used by Sutter Health. Based on this evidence, a jury could conclude that UNITE HERE's knowledge of Angelica's laundry facilities' problems in other parts of the country, and the union's extrapolation to what this meant concerning Sutter Health's sanitary precautions, was an unjustified fabrication based on purposeful avoidance of the truth, rather than on a mere negligent and inadequate investigation. Thus, whether UNITE HERE acted with actual malice is a question for the jury to resolve, and the matter must be remanded for a new trial.

II–V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

whether the jury found UNITE HERE engaged in fraud as defined by the court; but, even if it did, the jury might have so believed, even if the union did not act with actual malice.

*See footnote, *ante*, page 1193.

## DISPOSITION

· The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Blease, J., and Raye, J., concurred.

A petition for a rehearing was denied August 18, 2010, and the petition of plaintiffs and appellants for review by the Supreme Court was denied November 10, 2010, S185894.