[No. B187363. Second Dist., Div. Five. Jan. 11, 2007.]

BADRUDIN KURWA, Plaintiff and Respondent, v.
HARRINGTON, FOXX, DUBROW & CANTER, LLP, et al., Defendants
and Appellants.

**COUNSEL**

Harrington, Foxx, Dubrow & Canter, Dale B. Goldfarb and Todd D. McCormick for Defendants and Appellants.

Law Offices of Nolan E. Clark and Nolan E. Clark for Plaintiff and Respondent.

OPINION

**ARMSTRONG, Acting P. J.**—Plaintiff Badrudin Kurwa, M.D. (Dr. Kurwa), sued defendant lawyers Harrington, Foxx, Dubrow & Canter, LLP, and Dale B. Goldfarb (together, Harrington Foxx) for tortious interference with contractual relations. Harrington Foxx filed a special motion to strike, contending that the lawsuit was a SLAPP suit (strategic lawsuit against public participation), that is, a meritless action arising from Harrington Foxx's exercise of its constitutionally protected free speech rights. The trial court denied the motion, and Harrington Foxx appealed. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Kurwa and Mark Kislinger, M.D. (Dr. Kislinger), both licensed ophthalmologists, formed Trans Valley Eye Associates, Inc. (Trans Valley) in 1992 in order to enter into a capitation agreement (the Capitation Agreement) with the Huntington Provider Group,[1] a health maintenance organization serving patients in the San Gabriel Valley and environs (the HMO). Pursuant to the terms of the Capitation Agreement, Trans Valley agreed to provide to the HMO members ophthalmology care in consideration of the payment of a monthly per capita fee, that is, a fee based on the number of participating members of the HMO. This proved to be a fruitful arrangement: For instance, in the year prior to its termination, the Capitation Agreement resulted in receipts to Trans Valley of approximately $1.9 million dollars.

By the latter half of 2003, Dr. Kislinger no longer wished to maintain the status quo.[2] After consulting with Attorney Goldfarb, the latter wrote a letter on Dr. Kislinger's behalf, addressed to the president of the HMO (the Goldfarb Letter), which we quote in full:

"This office represents Mark Kislinger, M.D. We are writing to you on his behalf on a matter that involves the continuity of patient care.

---

[1] Huntington Provider Group later changed its name to Physicians Associates of the Greater San Gabriel Valley.

[2] The record reflects at least three reasons underlying Dr. Kislinger's desire to disassociate from Dr. Kurwa: (1) Dr. Kurwa was subject to a disciplinary proceeding before the California Medical Board in connection with his Medicare billing practices, which investigation ultimately led to a two-month suspension from the practice of medicine; (2) Dr. Kurwa was facing civil and criminal proceedings stemming from the alleged sexual battery of two female employees of Trans Valley; and (3) Dr. Kislinger believed that he was not being adequately compensated for the medical services he rendered under the Capitation Agreement.

"At the present time, there exists a provider agreement between Physician Associates and Trans Valle[y] Eye Associates. As you know, one of the two co-owners of Trans Valley, Dr. Badrudin Kurwa has had his license to practice medicine suspended in the State of California. Pursuant to the agreement between you and that entity, his participation in the provider agreement is automatically terminated. Moreover, we believe the corporate status of Trans Valley is inappropriate for the practice of medicine.

"To solve these problems, we have formed a new appropriate medical corporation for Dr. Kislinger. This new corporation will hire substantially all of the employees and will contract physicians of the previous entity, so there will be no interruption of services to patients or any noticeable change to anyone. To facilitate this transfer, we would request that PA transfer its provider agreement from Trans Valley to Mark Kislinger, M.D., Inc. Dr. Kurwa, because of his suspension, will not be a part of the new corporation.

"We would appreciate having the transfer take place as soon as possible to maintain continuity and quality of patient care, and to avoid any improper entanglement with Dr. Kurwa, whose license is suspended at the present time.

"I would appreciate discussing this matter with you to effectuate this change as smoothly as possible. Your cooperation is appreciated."

The HMO did indeed cooperate. During the following two-month period, the HMO terminated the Capitation Agreement with Trans Valley, issued a request for proposal soliciting a new ophthalmology provider to replace Trans Valley, and thereafter entered into a new capitation agreement with Dr. Kislinger's medical corporation.

In 2004, Dr. Kurwa filed suit against Dr. Kislinger, the HMO and others, alleging various causes of action in connection with the foregoing state of affairs. Among those allegations was the fourth cause of action, a derivative action brought on behalf of Trans Valley against Dr. Kislinger and his various medical corporations and Does 1 through 20 for tortious interference with Trans Valley's Capitation Agreement with the HMO. On or about August 11, 2005, Dr. Kurwa named Goldfarb and his law firm as Doe defendants 1 and 2.

Harrington Foxx filed a special motion to strike pursuant to section 425.16 of the Code of Civil Procedure, a so-called anti-SLAPP motion. In that

motion, Harrington Foxx argued that the complaint arose from its constitutionally protected right to send the Goldfarb Letter to the HMO; that the use of the United States Postal Service to transmit the letter constituted a "public forum"; that the Goldfarb Letter was in the public interest because it contained truthful information dealing with the provision of health care to thousands of patients; and that Dr. Kurwa could not show that he had a reasonable probability of prevailing on the merits.

The trial court ruled that Harrington Foxx failed to establish that the Goldfarb Letter was protected speech within the meaning of the anti-SLAPP statute: "The letter here was simply sent by counsel on behalf of a client, Kislinger, asking a for-profit private medical provider . . . to 'transfer its provider agreement from Trans Valley [of which plaintiff was a member] to Mark Kislinger, M.D., Inc.' of which plaintiff is not a member. The moving defendants have failed to meet their threshold burden of showing that the Fourth Cause of Action (interference with a contractual relationship), arises out of protected activity."

Harrington Foxx timely appealed the trial court's ruling.

## DISCUSSION

■ Code of Civil Procedure[3] section 425.16, subdivision (b) provides in pertinent part as follows: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Section 425.16 subdivision (e) explains that protected communications include ". . . any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Harrington Foxx argues that the mailing of the letter which it wrote to the HMO and which forms the basis of Dr. Kurwa's lawsuit constitutes "a public forum," and that "the subject matter of the letter drafted by [defendants] on behalf of their client potentially impacted thousands of patients, and therefore, is a matter of public interest." Neither contention has merit.

---

[3] Further statutory references are to this code.

A "public forum" is " 'traditionally defined as a place that is open to the public where information is freely exchanged.' " (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1006 [113 Cal.Rptr.2d 625].) "A public forum is a place open to the use of the general public ' "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." ' . . ." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1130 [2 Cal.Rptr.3d 385], citations omitted.) The letter here at issue was not sent to members of the HMO. Rather, it was a business letter addressed to the intended recipient—the president of the HMO—from an attorney for one of two shareholders of a corporation providing medical services to the HMO's members. As such, it does not fit the definition of a public forum.

Defendants rely on *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 674 [64 Cal.Rptr.2d 222] (*Macias*) to argue that "The term 'public forum' has been construed broadly by the courts, and includes speech by mail." The case is inapposite. In *Macias*, the "speech by mail" was a campaign flyer mailed to 10,000 union members in connection with an upcoming election for the office of union president. The *Macias* court concluded that "Speech by mail, i.e., the mailing of a campaign flyer, is a recognized public forum under the SLAPP statute." (*Id.* at p. 674.) Again, a letter sent by an attorney to the president of the company with whom his client does business is not remotely similar to a campaign flyer mailed to 10,000 prospective voters.

Neither were the contents of the letter a matter of public interest within the meaning of the statute. As our colleagues explained in *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107 [1 Cal.Rptr.3d 501], " 'The definition of "public interest" within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]' (*Damon* [*v. Ocean Hills Journalism Club* (2000)] 85 Cal.App.4th [468,] 479 [102 Cal.Rptr.2d 205], citing *Macias, supra,* 55 Cal.App.4th at p. 674; and *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650–651 [49 Cal.Rptr.2d 620] (*Wollersheim*).) 'Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals.' (*Wollersheim, supra,* 42 Cal.App.4th at p. 650 [citing product liability suits, and real estate or investment scams as examples]; also quoted in *Macias, supra,* 55 Cal.App.4th at p. 674 and *Damon, supra,* 85 Cal.App.4th at p. 479.)" (*Du Charme, supra,* 110 Cal.App.4th at p. 115.)

"In *Damon*, for example, allegedly defamatory statements about the manager of a homeowners association governing 3,000 individuals in 1,633 homes were made at the association's board of directors meeting and in its newsletter. ([*Damon v. Ocean Hills Journalism Club, supra*, 85 Cal.App.4th] at pp. 471–473, 479.) The court found that because each of the statements concerned 'the manner in which a large residential community would be governed,' they concerned issues of public interest under section 425.16, subdivision (e)(3). (*Damon* at pp. 474–475.) . . . In *Damon*, 'each of the alleged defamatory statements concerned (1) the decision whether to continue to be self-governed or to switch to a professional management company; and/or (2) Damon's competency to manage the Association. These statements pertained to issues of public interest within the Ocean Hills community.' (*Ibid.*) 'Moreover, the statements were made in connection with the Board elections and recall campaigns.' (*Ibid.*) In other words, they were made in the context of a public debate about how the community would be governed in the future. (See *id.* at pp. 471–473.) Indeed, '[b]y the end of 1997, the senior citizen residents of Ocean Hills were largely split into two camps: those who favored Damon's continued service and those who wanted Damon terminated as general manager.' (*Id.* at p. 472.) The allegedly defamatory statements of those in the second group are the very type of speech the Legislature sought to protect in order 'to encourage continued participation in matters of public significance.' (§ 425.16, subd. (a).)" (*Du Charme v. International Brotherhood of Electrical Workers, supra*, 110 Cal.App.4th at p. 116.)

Similarly, in *Macias, supra*, 55 Cal.App.4th 669, "the defamation action arose out of a political flyer distributed to union members in the course of a campaign to elect its officers. (*Id.* at pp. 671–672.) '[T]he court found that campaign statements made during a union election constituted a "public" issue because the statements affected 10,000 union members and concerned a fundamental political matter—the qualifications of a candidate to run for office.' (*Damon v. Ocean Hills Journalism Club, supra*, 85 Cal.App.4th p. 479, citing *Macias, supra*, 55 Cal.App.4th at pp. 673–674 ['*The public issue was a union election* affecting 10,000 members and [plaintiff/appellant]'s qualifications to serve as president.' (Italics added.].)" (*Du Charme v. International Brotherhood of Electrical Workers, supra*, 110 Cal.App.4th at p. 116.)

As the *Du Charme* court explained, *Damon* and *Macias* are examples of cases "in which First Amendment activity is connected to an issue of interest to only a limited but definable *portion* of the public, a *narrow* segment of society consisting of the members of a private group or organization—a 3,000-member homeowners association in the former, a 10,000-member

union local in the latter. These are cases in which private conduct 'affects a *community* [in the broad sense of the word] in a manner similar to that of a governmental entity' (*Damon, supra,* 85 Cal.App.4th at p. 479, italics added). As previously noted, the allegedly defamatory statements in both cases were made not only in connection with an issue of interest to the members of the particular community, but also in the context of an ongoing controversy, debate or discussion within that community—a decision about future association governance in the former, an election of officers in the latter. The statements in *Macias* were designed to persuade union members to vote against a particular candidate for union office. In *Damon,* the statements were calculated to persuade members of the homeowners association to change its method of governance. Thus protection of the statements at issue in *Damon* and *Macias* serves the anti-SLAPP statute's purpose of encouraging *participation* in an ongoing controversy, debate or discussion." (*Du Charme v. International Brotherhood of Electrical Workers, supra,* 110 Cal.App.4th at p. 118.) The same cannot be said of the speech at issue in this case.

First, we note that the statements at issue in this case are not, as Harrington Foxx would have us believe, the undisputed fact of Dr. Kurwa's suspension or the disputed alleged deficiencies in the corporate status of Trans Valley. Rather, the gist of Dr. Kurwa's lawsuit against Dr. Kislinger is that the latter, in breach of his fiduciary duties, misappropriated an asset of Trans Valley to his own use and benefit. The means by which Dr. Kislinger allegedly achieved this objective was through the Goldfarb Letter, which requested the HMO to terminate the Capitation Agreement with Trans Valley and to enter into a new agreement with Dr. Kislinger alone. It is this "speech" which forms the basis of Dr. Kurwa's complaint against Harrington Foxx.

■ Unlike the homeowners association members in *Damon* and the union members in *Macias,* there was no upcoming referendum pursuant to which members of the HMO would decide whether Dr. Kurwa should remain an authorized provider under the HMO's health plan. Thus, in the terms of *Du Charme,* there was no "ongoing controversy, debate or discussion," participation in which the anti-SLAPP statute was meant to encourage. Rather, this was a private matter between the principals of Trans Valley and the HMO which was ultimately concerned solely with the issue of who would be the signatory of the Capitation Agreement and thereby reap the substantial benefits of that agreement.

Harrington Foxx argues that because the Goldfarb Letter concerned the provision of health care, and health care is a matter of public interest, the

requirements of section 425.16, subdivision (e)(4) were met. A similar argument was made and rejected in *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924–925 [130 Cal.Rptr.2d 81], where the defendants argued that because the statement at issue concerned an unlawful workplace activity engaged in by an employee at a publicly financed institution, it was necessarily of "public interest."

Harrington Foxx also maintains that this case is directly analogous to *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515 [44 Cal.Rptr.3d 517] (*Integrated Healthcare*), which held that the statements of the defendant physician, who was on staff at a hospital owned by the plaintiff, concerning the financial viability of the hospital were protected speech under the anti-SLAPP statute. Harrington Foxx argues that because both cases involve a written communication (a letter in this case/an e-mail in *Fitzgibbons*) between an interested party (Dr. Kislinger/ Dr. Fitzgibbons) to a limited audience (the president of the HMO/members of the medical executive committee) concerning a private health care provider (Trans Valley Eye Associates/Western Medical Center), we are to conclude that the Goldfarb Letter constituted protected speech within the meaning of the anti-SLAPP statute. However, the *Integrated Healthcare* court found the "public interest" requirement of section 425.16, subdivision (e)(4) was met in that case, not under the reasoning of *Damon*, *Macias* and *Du Charme* (that is, as a limited but definable portion of the public engaged in an ongoing controversy, debate or discussion) but as a matter of interest to the general public. (*Integrated Healthcare*, *supra*, 140 Cal.App.4th at p. 524 ["We have no difficulty placing the financial survival of four hospitals within the county into the category of 'widespread public interest,' and thus not subject to the 'ongoing controversy' rule enunciated in *Du Charme*."].) The identity of the doctors who own the ophthalmologic service provider under contract to the HMO is simply not a matter of widespread public interest.

In sum, because we conclude that the Goldfarb Letter was not made in the context of "an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance" (*Du Charme v. International Brotherhood of Electrical Workers*, *supra*, 110 Cal.App.4th at p. 119), it is not protected speech under the anti-SLAPP law. Accordingly, we concur with the trial court that defendants "failed to meet their threshold burden of showing that the Fourth Cause of Action (interference with a contractual relationship), arises out of protected activity." Harrington Foxx's additional arguments to the effect that, for various reasons, Dr. Kurwa cannot prevail at trial are properly the subject of a demurrer, not an anti-SLAPP motion.

## DISPOSITION

The order is affirmed. Plaintiff is to recover his costs on appeal.

Mosk, J., and Kriegler, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 28, 2007, S150296.