Filed 3/7/14  Rogers v. Hochshuler CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MARCY ROGERS, | D061633 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00099434-CU-OE-CTL) |
| STEPHEN HOCHSHULER et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Lawton Law Firm and Dan Lawton for Plaintiff and Appellant.

Chapin Fitzgerald Sullivan & Bottini, Kenneth M. Fitzgerald and Douglas J. Brown for Defendants and Respondents.

Plaintiff Marcy Rogers was the president and chief executive officer (CEO) of

SpineMark Corporation (SpineMark), a company that specialized in the treatment of

spinal disorders.  She was fired for alleged mismanagement and allegedly taking

improper expense reimbursements.  SpineMark sent a report to its shareholders detailing the reasons for her termination.

Rogers thereafter filed this action, alleging. among other things, the report defamed her.  SpineMark responded by filing an anti-SLAPP motion to strike her defamation claim under Code of Civil Procedure[1] section 425.16, asserting the report to the shareholders was an issue of public interest because the report was of interest to a limited but definable portion of the public:  SpineMark's shareholders.

The court granted the motion, striking her defamation claim and dismissing that claim.  On appeal, Rogers asserts the court erred in granting the motion to strike because (1) a privately held company's defamatory statements contained in a confidential report to shareholders are not protected by the anti-SLAPP statute; (2) Rogers was not a limited purpose public figure; and (3) she made a prima facie showing of malice.  We affirm.

FACTUAL BACKGROUND

A.  *SpineMark*

SpineMark was a corporation, based in San Diego, whose goal was to generate revenue through the treatment and research of spinal disorders.  It did so through affiliations with orthopedic surgeons and other medical professionals, teaching hospitals, clinical researchers, and spinal implant inventors and manufacturers.  SpineMark's sought to do this by establishing "Centers of Excellence," which were spinal disorder treatment sites where surgeons and other health care professionals would work with hospitals to

---

[1]     All further undesignated statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

promote collaborative treatment approaches to improve patient outcomes and advance the science of spinal disorder treatment. The company also formed research centers in which physicians, inventors, researchers, and medical device companies performed clinical research and patient trials for medical device development and the FDA approval process.

From May 2006 to August 2010 Rogers was SpineMark's president and CEO. Defendants Dr. Stephen Hochschuler, Richard Lee, and John True all served on SpineMark's board of directors (the Board).

B. *SpineMark's Concerns Regarding Roger's Performance*

By early 2010 SpineMark was struggling financially and on the brink of insolvency. The Board was concerned about Rogers's conduct and contentiousness, particularly in light of the company's persistent failures to meet performance targets that she assured the Board were attainable. At a February 2010 meeting, the Board informed Rogers that she risked dismissal if her management team failed to meet SpineMark's financial targets or if she continued to disregard and defy the Board's directives. Rogers acknowledged this risk of termination and the terms of her continued employment with SpineMark through a written agreement dated March 1, 2010.

Despite SpineMark's financial troubles, by August 2010 Rogers had charged over $17,500 to the company for personal expenses, including hundreds of dollars for her personal driver, thousands of dollars to purchase miles for flight upgrades and a "Girls Night Out" dinner with her personal friends.

Because of the company's financial condition, in around August 2010 the Board commissioned two reviews at SpineMark's San Diego office: (1) an operational assessment to identify performance issues and other operational problems within the organization, and (2) a financial review to assess discrepancies within one of the company's accounts. The Board hired a consultant, Michael Piccirillo, to perform these reviews. Rogers initially attempted to dissuade Piccirillo from traveling to San Diego to do so. Once the operational assessment had been scheduled, Rogers then attempted to obstruct it by instructing all of SpineMark's employees to stay out of the office on the day scheduled for Piccirillo's visit, informing them that they all were receiving a "day off for their outstanding performance." Rogers also sent a text message to her secretary, asking her to delete her e-mail files and to put them on a disk for her to take home. However, her secretary did not follow that instruction.

Despite Rogers's actions in trying to avoid the reviews, both were completed. The two reviews revealed significant problems with her management approach, decision making, financial practices, and tactical execution within SpineMark.

The SpineMark Operational Assessment Report (the Report) was produced following the reviews. The Report centered on "the effectiveness and efficiency of the operations as well as the quality and motivation of the SpineMark employees in the San Diego office to see if there is a viable future for the company."

The report concluded that "the company has simply been mismanaged—poor management decision making, an unfocused strategy, lack of operational processes, and wasteful extravagance have all contributed to the current crisis within SpineMark." The

4

Report further stated that "[i]t can be argued that motivation and communication has actually risen since the departure of [Rogers]—with transparency and honesty has come communication and a new team spirit."

The Report concluded: "Given the lack of confidence that the Board of Directors, employees and the majority of shareholders and customers now [have] in [Rogers] makes her ability to command respect extremely questionable. Given a history of poor decision making, her refusal to actively enact cost containment measures and her questionable business practices it is inconceivable that SpineMark Corporation retain her services as Chief Executive Officer."

The Report stated: "It is very clear in discussion with [Rogers] and employees of SpineMark that there is tremendous friction between the CEO and the Board. . . . [¶] There is little evidence that [Rogers] follows the Board's instructions or recognizes its authority; it appears she has even challenged the validity of the Board of Directors. [Rogers] has tried to protect herself by: [¶] Ensuring the Board did not have a 'quorum'— a full complement of members. [¶] Arranging the election of members who are sympathetic to her personal cause."

The Report concluded that "the most consistently reported 'downer' to morale is the behavior of the CEO. 'Constantly side steps problems—prone to heavy exaggeration—lack of timely feedback [¶] Blames others or extenuating circumstances when things go wrong [¶] Doesn't worry when she is consistently late for work or for meetings [¶] Releases good people who disagree with her [¶] Frequently tries to remind people how much the company relies on her [¶] Tends to criticize staff in public rather

5

than in private—can be quite abusive [¶] Likes to be in the limelight [¶] Tends to plagiarize and take credit for other peoples' work [¶] Employs or contracts people based on friendships or their support of her ideas—these people may or may not have the required qualifications for the job [¶] Always out of the office—misses management meetings.'"

Thus, the Report not only detailed issues with her expenses, it also identified issues centering on Rogers's management:

> "There is also considerable evidence to show that [Rogers] has abused her position as CEO, claiming personal expenses on the company, and claiming expenses which no CEO knowing the position of the company would claim—*see Appendix K* (*page 48*).
>
> "**[Rogers] appears to have failed to recognize the need to change her personal approach and strategy in order to fix the increasing performance gap between fantasy and reality.**" (Original boldface and italics.)

During the assessment, eight of the company's nine San Diego-based employees expressed a vote of "no confidence" in Rogers. The ninth employee was unavailable to register a vote. Creditors, including companies and physicians, had also grown increasingly frustrated and angry with SpineMark.

On August 9, 2010, after reviewing the Report, the Board voted to remove Rogers as president and CEO.

By e-mail dated September 2, 2010, SpineMark's Board notified the company's 49 shareholders of Rogers's removal from the company. That e-mail contained a copy of the Report, and its first paragraph highlighted the Report's confidential nature:

6

"We are writing to provide information to all shareholders of SpineMark Corporation concerning its operation and recent events. As a shareholder, you have an interest in SpineMark's business. *Because of the sensitive information contained in the attached report, it is intended for your eyes only and should not be disseminated or distributed to non-shareholders.* The report reflects statements and information uncovered thus far from an ongoing investigation." (Italics added).

Each page of the Report contained an additional disclaimer reminding the shareholders to maintain its confidentiality: "This report and all attachments and information contained herein are considered strictly confidential and are not to be disclosed, disseminated, or discussed with non-shareholders."

C. *Rogers's Prior History of Similar Mismanagement*

Before Rogers moved to San Diego she was the subject of extensive news coverage detailing her prior mismanagement of two charitable foundations in Texas. She sued for libel, but the court granted summary judgment in favor of the newspaper, and the Texas Court of Appeal affirmed that judgment, based on the truth of that coverage. (*Rogers v. Dallas Morning News* (Tex.Ct.App. 1994) 889 S.W.2d 467, 472-473 (*Rogers*).) Several newspaper articles (the *Dallas Morning News* alone published 12 in 1991), and the libel suit Rogers brought after their publication, chronicled Rogers's management of two charities. (*See Rogers, supra,* 889 S.W.2d at pp. 468, 473.) Rogers's actions led the Texas Attorney General to open a special investigation to examine "whether [her charity] was used as a vehicle to enable Marcy to make a profit for herself through her private business."

A *Texas Monthly* article described Rogers's financial exploitation of two charities' donations to assist her ascent into Dallas society. Rogers used the first charity's money to fund a lavish lifestyle, which eventually led her to resign after being accused of "wasting foundation money on extravagant gifts and entertainment," "diverting restricted patient funds to meet payroll and pay overhead," "using the foundation's van as collateral on a loan," and "hiring one of her boyfriends as a bookkeeper."

Rogers thereafter worked for a different charity. The *Dallas Morning News* investigated and revealed her mismanagement of its finances. (*Rogers, supra,* 889 S.W.2d at p. 470.) That investigation revealed that (1) the foundation was "disorganized and deeply in debt"; (2) Rogers "spent more on promotions than on medical care"; (3) "far less money actually went to helping the children than Marcy portrayed"; (4) there was a "murky relationship between [the second charity's] finances and Marcy's personal expenses"; and (5) Rogers "ran independent medical consulting ventures, for her own profit, out of [her charity's] offices." Rogers "violated rule after rule about not using a position of fiduciary responsibility within a nonprofit organization for personal benefit."

In response, Rogers sued the *Dallas Morning News* for libel. The trial court granted summary judgment for the newspaper, and this ruling was affirmed on appeal, based on the articles' truth. (*Rogers, supra,* 889 S.W.2d at p. 468.) In that published decision, the Texas Court of Appeal upheld the trial court's conclusion that the articles accurately depicted Rogers's actions: "In essence, the [Dallas Morning] News articles raised questions about Rogers' financial competency as [her second charity's] chief executive officer and about whether she had misled the public about [its] charitable

8

achievements. . . .  [T]he [Dallas Morning News] conclusively established the substantial truth of its articles."  (*Id.* at p. 473.)

PROCEDURAL BACKGROUND

The same day the Report was sent to SpineMark's shareholders, Rogers filed this action against SpineMark, Hochschuler, Lee, and True.  Thereafter, on September 21, 2010, SpineMark filed a chapter 7 bankruptcy petition in the Eastern District of Texas. Rogers then obtained relief from the automatic stay to allow her to pursue claims against the individual defendants.  In May 2011 she filed her first amended complaint, which included her defamation claim.

The defendants responded with an anti-SLAPP motion to strike, seeking only to strike the defamation claim.  Rogers opposed the motion.

The court granted the motion.  In doing so, the court made the following findings:

> "The only modestly close question in step 1 of the analysis is whether the drafting and dissemination of the Report was 'in connection with a public issue or an issue of public interest.'  The court finds that it was.  Far from relating to purely private matters, the Report informed 49 board members and shareholders of the status of the corporation and the reasons for terminating plaintiff. The shareholders are members of the public, and the board owed a fiduciary duty to its shareholders to keep them informed.  The court does not agree with plaintiff's apparent position that the court is required to wrench the challenged statements from the context of the Report as a whole.  Nor does the court agree with plaintiff that the result in the *Du Charme* [*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119] case mandates denial of the special motion to strike.  Plaintiff's employment was terminated on August 9, 2010, and the Report was sent to the shareholders less than a month later.  This was, it is undisputed, the shareholders' first notice of an event (the firing of the leader of a failing company) the shareholders would naturally be concerned about.  It can reasonably be inferred that investors would

9

want to know, in detail, the reasons behind a decision of such import. This is particularly so in light of the controversy and debate engendered on this very subject just a few months before."

Having found that the anti-SLAPP statute had been triggered, the court then found that Rogers could not meet her burden of showing a probability of success on her defamation claim. In doing so, the court found that Rogers would be required to prove the alleged defamatory statements were published with malice, and that she could not meet that burden. In this regard the court found that Rogers was at least a "limited purpose public figure." The court also found that the Report was subject to the "common interest privilege" under Civil Code section 47, subdivision (c).

DISCUSSION

I. *STANDARD OF REVIEW*

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' [Citation.] However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

II. *ANALYSIS*

Section 425.16, subdivision (b)(1) provides that any cause of action against a person arising from that person's exercise of free speech in connection with a public issue is subject to a special motion to strike. As the California Supreme Court explained:

10

"'The Legislature enacted section 425.16 to prevent and deter "lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." [Citation.]  Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought "'to prevent SLAPPs by ending them early and without great cost to the SLAPP target.'"'"  (*Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal. 4th at p. 278.)

In determining whether an action is subject to a special motion to strike under the anti-SLAPP statute, courts engage in a two-step process.  First, the defendant must make a threshold showing that the claim arises from protected activity.  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.)  If the defendant makes such a showing, the burden then shifts to the plaintiff, who must demonstrate a probability of prevailing on the claim.  (*Taus, at p. 712;* Navellier, *at p. 88.*)

Defamation causes of action are "favored" targets of anti-SLAPP motions. (*Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1400, fn. 9.)

A.  *Step* 1

In step 1, defendants are required only to make a prima facie showing that the challenged speech fits within the scope of the statute's protection.  (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 820, overruled on another ground in  *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.)  In this case, the relevant category provides that "any other conduct in furtherance of the exercise of the

11

constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e), cl. (4).)  This provision of the anti-SLAPP statute applies to Rogers' defamation cause of action.

1.  *The Extent of the Report's publication*

Rogers asserts that defendants are not entitled to anti-SLAPP protection because they published the Report to "only 49 shareholders" and did so in a private, confidential manner.  Rogers contends "[n]o reported case has extended anti-SLAPP protection to [a] private and confidential corporate report distributed to so few recipients."  We reject this contention.

The scope of the publication does not control whether a statement concerned a public issue so as to qualify as protected speech:  "*Regardless of the scope of publication, protection under the anti-SLAPP statute turns on whether the activity of the defendant involves the right of petition or free speech in connection with a public issue.*"  (*Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1282, italics added.)  "[T]he question whether . . . statements concerned a matter of public interest cannot be determined on the basis of media coverage, notoriety or potential newsworthiness."  (*Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 1131-1132, disapproved on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106.)

Indeed, the anti-SLAPP statute has been applied in cases involving *private* communications to *just a single person.*  (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1467-1470.)

What is important is the substance of the communication. The number of people to whom the defendants sent the Report, and its confidential status, have no bearing on the anti-SLAPP statute's application.

2. *Ongoing controversy, dispute, or discussion within a limited but definable portion of the public*

Rogers asserts that the statements made in the Report were not subject to anti-SLAPP protection because they (1) did not directly affect a large number of people beyond the direct participants; and (2) were not a topic of widespread, public interest. This contention is unavailing.

To fall within the protection of the anti-SLAPP statute, it is not necessary for an issue to be of interest to the public at large. A statement satisfies the statute's public issue/issue of public interest requirement where it is "not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), . . . [and] occur[s] in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers, supra,* 110 Cal.App.4th at p. 119, fn. omitted (*Du Charme*).)

SpineMark's shareholders had a sufficient interest in SpineMark's management and operations for the Report, which occurred in the context of such an ongoing discussion, to constitute protected speech. (See *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 474-475 [holding that allegedly defamatory statements

13

pertain to an issue of public interest where they concerned the manner in which a residential community would be governed].)

The company's performance and Rogers's suitability as SpineMark's CEO were very much in discussion, and very much in debate, before the Report was prepared or distributed. The discussion about the company's performance under her leadership extended beyond SpineMark's Board and specifically involved SpineMark's shareholders.

Thus, Rogers's performance as CEO was a matter of discussion and debate within a limited but definable portion of the public; i.e., the community of SpineMark's shareholders. The Report was part of that ongoing discussion and was, therefore, a statement of public concern within the meaning of the anti-SLAPP statute.

On appeal, Rogers acknowledges the *Du Charme* rule provides anti-SLAPP protection to communications that were not of interest to the public at large. However, she contends it cannot apply here because her termination ended any ongoing discussion before the respondents published the Report and because the rule should extend only to labor unions and homeowners associations. These contentions are unavailing.

The Report itself reflects the fact there was an ongoing discussion, as most of its 57 pages are dedicated to a discussion of SpineMark's strategy and performance.

Even if this discussion within the community of SpineMark's shareholders pertained exclusively to Rogers and her performance, as she contends, there is no reason that her termination would have ended it. Media coverage of corporate executives regularly demonstrates this, with the discussion about the underpinnings and consequences of an executive's departure often lingering for months after the fact. The

14

termination of an executive is in this regard very different from the termination of a lower level manager, such as the assistant manager whose termination in *Du Charme* ended any discussion, debate, or controversy in which union members would have had an interest in participating. (*Du Charme, supra,* 110 Cal.App.4th at p. 118.)

In support of her position Rogers relies on *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, in which a union published unsubstantiated allegations of wrongdoing that earlier led to the firing of a janitor responsible for supervising eight other janitors. (*Id.* at p. 916.) There, the Court of Appeal held that "unlawful workplace activity below some threshold level of significance is not an issue of public interest, even though it implicates a public policy." (*Id.* at p. 924.) However, *Rivero* is distinguishable.

Here, the Report did not limit its discussion to "unlawful workplace activity." As the trial court put it: "Far from relating to purely private matters, the Report informed 49 board members and shareholders of the status of the corporation and the reasons for terminating plaintiff. The shareholders are members of the public, and the board owed a fiduciary duty to its shareholders to keep them informed."

*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 (*Terry*) is instructive. There, two church youth group leaders sued a church, pastor, and church leaders for defamation after the defendant distributed a report to parents of youth group members, detailing allegations that the plaintiffs had engaged in an inappropriate relationship with a youth group member. (*Id.* at pp. 1539-1541.) Although the plaintiffs resigned their positions and withdrew from church membership, the respondents

15

published the subject report the following week, when it was discussed with parents of youth group members in closed meetings of the church, and did so twice again three days after that. (*Id.* at pp. 1541-1543.)

Distinguishing *Du Charme* and *Rivero,* the Court of Appeal rejected the plaintiffs' argument that there was no ongoing controversy, dispute, or discussion because they had already resigned from the youth program and from church membership by the time of publication. (*Terry, supra,* 131 Cal.App.4th at pp. 1549-1550.) As the Court of Appeal in *Terry* explained, "plaintiffs did not have the power to foreclose discussion by resigning." (*Id.* at p. 1550.) The court went on to explain that although the plaintiffs' resignation eliminated the need for a church trial, it did not eliminate the parents' interest in determining the full extent of the plaintiffs' wrongdoing and whether their own children may have been the subject of inappropriate contact by the plaintiffs. (*Ibid.*)

Like the plaintiffs' resignation in *Terry,* although Rogers's departure eliminated the need to determine whether she should continue as SpineMark's CEO, it did not foreclose discussion of her tenure. Just as the parents in *Terry* had a continued interest in ascertaining the full extent of the plaintiffs' misconduct, SpineMark's shareholders had a continued interest in assessing the impact of Rogers's mismanagement of the company. That assessment would naturally have included, among other things, continued discussion about the extent of any misconduct on Rogers's part; the consequences of such misconduct on SpineMark; and what actions, if any, the company should take as a result. All of these things "embod[y] the public policy of encouraging *participation* in matters of

16

public significance" (*Du Charme, supra,* 110 Cal.App.4th at pp. 118-119, fn. omitted) and thus justify anti-SLAPP protection.

In a declaration filed in support of the motion to strike, Kevin Liang, SpineMark's vice president of research and education, confirmed that Rogers's performance as CEO was a regular subject of discussion at SpineMark through the company's bankruptcy filing in September 2010, several weeks after Rogers's termination.

Indeed, even Rogers's own conduct demonstrates that the discussion was ongoing after her termination. On the same day the respondents published the Report to the company's shareholders, Rogers filed this lawsuit, alleging that SpineMark and its directors had wrongfully terminated her. By virtue of her own lawsuit, there was still a controversy surrounding her performance as CEO and the company's grounds for terminating her employment. Rogers cannot contend that her termination closed any discussion within the community of SpineMark shareholders regarding her performance when *she* still believed the issue was the subject of controversy.

3. *The Du Charme rule is not limited to unions and homeowners associations*

Seeking to avoid the *Du Charme* rule, Rogers asserts "appellate courts have only extended this special category of anti-SLAPP protection to two types of communities: labor unions and homeowners associations ('HOAs')." We reject this contention. The *Terry* case, discussed, *ante*, involved a church and the alleged misconduct of two youth group leaders, not a labor union or HOA. (*Terry, supra,* 131 Cal.App.4th 1534.)

Moreover, as the Court of Appeal in *Du Charme* noted, the rule is not so limited, but is intended for *any* situation involving "a limited, but definable portion of the public

17

(a private group, organization, or community)." (*Du Charme, supra,* 110 Cal.App.4th at p. 119.) A corporation with multiple shareholders, like SpineMark, constitutes a limited but definable private organization, and thus falls within the scope of this rule.

4. *SpineMark and Rogers were subjects of public interest within the meaning of the anti-SLAPP statute*

Even if there had not been such an ongoing controversy, dispute, or discussion within the SpineMark community as to SpineMark's performance under Rogers's leadership, the allegedly defamatory statements would still fall within the anti-SLAPP statute's protection because Rogers and SpineMark were themselves subjects of public interest. The definition of "public interest" within the meaning of the anti-SLAPP statute has been "broadly construed" to include not only governmental matters, but also private conduct that either impacts a broad segment of society or that affects only a particular community. (*Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP* (2007) 146 Cal.App.4th 841, 846.) The most commonly articulated definitions of statements made in connection with a public issue focus on whether: "[¶] (1) The subject of the statement or activity precipitating the claim was a person or entity in the public eye. [Citation.] [¶] (2) The statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants. [Citation.] [¶] (3) The statement or activity precipitating the claim involved a topic of widespread public interest." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33.)

18

SpineMark itself was the subject of public interest and, as the company's CEO, Rogers's conduct affected a large number of people. By the time of the Report's publication, SpineMark had 49 shareholders and had grown in five years to become a company with approximately $20 million in revenue. Beyond these shareholders and SpineMark's 26 employees, the threat posed by Rogers's mismanagement also reached health care professionals, patients, researchers, and FDA-regulated medical device companies that depended on the company. In addition to having established spine research organization sites across North America and a medical conference center that provided surgical training programs, SpineMark had developed an international network of Centers of Excellence, to which SpineMark provided services towards the development of multidisciplinary spine centers. Through these centers, SpineMark conducted business with numerous physicians and medical device companies, including publicly traded companies like Medtronic. The company's poor performance under Rogers's leadership affected over 100 patients in research trials and threatened the viability of ongoing clinical research for 19 medical device companies undergoing the FDA approval process.

In addition to her conduct as SpineMark's CEO affecting a large number of people, Rogers, herself, was also in the public eye. A statement is "in the public interest" within the meaning of the anti-SLAPP statute when it involves a person who is in the public eye. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042 [statements concerned "an issue of public interest" because they pertained to a prominent Finnish businessman with some celebrity in his home country].)

19

By the time of the Report's publication, Rogers was such a person. She had appeared as a guest on the television show Donahue, and she had been plugged in the nationally syndicated column "Dear Abby." She was an influential editor, author, lecturer, sponsor of Congressional action, guest of the First Lady of the United States, and a "key opinion leader" who had won numerous awards for her important work in medicine. Touting her public significance as a widely known and sought-after commentator, public speaker, and author, Rogers's personal website (http://www.marcytrogers.com) stated:

> "[Rogers] has been selected as a Feature Editor for both www.Spine-health.com, and www.spineuniverse.com, the two leading resources for information on spine care for patients and physicians. In addition, [Rogers] has been an invited lecturer to dozens of medical societies and company meetings, including Philips, the North American Spine Society, American Society for Interventional Pain Physicians, International Congress of Plastic Surgery, American Cleft Palate Association, Sofamor Danek, Depuy Spine, Kimberly Clark, and a regular speaker at Active Communications International's Spine and Pain Symposiums. She has co-authored book chapters and has been published in leading medical publications in the fields of spine, pain and craniofacial surgery."

With regard to her work at SpineMark, Rogers sought public attention and favorable publicity through her website:

> "With [Rogers] as President and CEO, SpineMark Corporation has become a leader in the planning, development, marketing and management of successful Spine Centers of Excellence in hospitals, surgery centers and freestanding institutions. [¶] Under [Rogers's] direction, SpineMark consulted on, developed, implemented or managed 22 Centers of Excellence across the United States, with additional Spine Center projectsopening [*sic*] in Mexico, Spain, Turkey and the Netherlands through SpineMark International."

20

Her website concluded by stating: "[Rogers] has established herself as a key opinion leader and development specialist among her clients, professional colleagues and peers."

As we have discussed, *ante*, *Texas Monthly* magazine and the *Dallas Morning News* also believed Rogers, and her pattern of mismanagement and misappropriation of organizational funds for personal use, were of public interest, enough so that they published extensive articles about her. As noted, *ante*, the *Dallas Morning News's* successful defense of her defamation action arising from its articles even resulted in a published court opinion. (*Rogers, supra,* 889 S.W.2d 467.) As the Court of Appeal held in *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 247-248, the anti-SLAPP statute covers statements made about an individual who "has been profiled, quoted, interviewed, and has used the media for [her] professional advantage many times."

B. *Step 2*

Because defendants have made a prima facie showing that the Report is protected speech, Rogers was required to demonstrate a probability of prevailing on her defamation cause of action to defeat the respondents' motion. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.) In assessing whether a plaintiff has shown a probability of prevailing, courts consider the pleadings and evidence submitted by both the plaintiff and the defendant. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 80.)

21

Although "the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiffs attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) In addition, a plaintiff cannot rely on the allegations of his or her complaint, but must present competent and admissible evidence showing that he or she has a legally sufficient defamation claim that is "substantiated." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236.)

As Rogers acknowledges, her defamation claim is subject to the defense of common interest privilege as set forth in Civil Code section 47, subdivision (c) and to overcome that privilege she must demonstrate that the statements in the Report were made with malice. However, Rogers asserts the court erred in finding that she did not make a prima facie case of malice to overcome that common interest privilege. This contention is unavailing.

"A privileged publication or broadcast is one made: [¶] (c) In a communication, *without malice*, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (Civ. Code, § 47, subd. (c), italics added.)

The malice needed to overcome a qualified privilege is "actual malice." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 944, overruled on another ground in *White v. Ultramar*

22

(1999) 21 Cal.4th 563, 574.) To demonstrate actual malice, a plaintiff must prove the subject publication was "motivated by hatred or ill will toward the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 740.) This standard of actual malice is a "'daunting one,'" focusing solely on the defendant's subjective state of mind at the time of publication and requires more than mere negligence or even "'gross or . . . extreme negligence.'" (*Sutter Health v. UNITE HERE* (2010) 186 Cal.App.4th 1193, 1210-1211.)

1. *Clear and convincing evidence of malice*

As we have discussed, *ante,* Rogers qualifies as a "limited purpose public figure." As such, she must "prove by clear and convincing evidence that [the] alleged defamatory statement[s were] made with knowledge of falsity or reckless disregard for truth." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577.) "To meet the clear and convincing standard, the evidence must be such ' "as to command the unhesitating assent of every reasonable mind." ' [Citation.] [¶] The reckless disregard test requires a high degree of awareness of the probable falsity of the defendant's statement. . . . This is a subjective test, focused on the defendant's attitude toward the veracity of the published material, as opposed to his or her attitude toward the plaintiff." (*Id.* at p. 1579.)

In addressing the malice issue, Rogers focuses solely on her reimbursements, asserting that if SpineMark had checked with their chief financial officer, Richard Guzman, they would have learned that the reimbursements were approved by him.

However, she ignores that portion of the Report concerning SpineMark's performance under Rogers's leadership and her performance as the company's CEO.

Moreover, this is not evidence of malice. "[Malice] is not measured by what a reasonably prudent person would have published, or would have investigated before publishing." (*Sutter Health v. UNITE HERE, supra,* 186 Cal.App.4th at pp. 1210-1211.)

Additionally, the evidence shows that the defendants *did* conduct an investigation. Piccirillo wrote the Report after conducting an operational assessment of SpineMark that included a physical visit to the company's San Diego office, interviews with the company's San Diego employees, telephone discussions with the company's Plano employees, and a review of the company's books and records. Regarding the Report's statements concerning personal expenses Rogers charged to the company, Piccirillo obtained the data from SpineMark's bookkeeper and Rogers's executive assistant, and he supported those statements with a three-page appendix detailing her 2010 personal expenses, while expressly disclaiming, "no detailed checks have been made into [her] expenses [for] 2007, 2008, and 2009."

Moreover, in criticizing defendants' failure to consult with Guzman before publishing the Report Rogers ignores a key fact contained in his declaration in support of the anti-SLAPP motion: he resigned as SpineMark's CFO effective July 31, 2010. This was *before* the defendants retained Piccirillo in August 2010 to conduct the operational assessment that led to the Report's eventual publication on September 2, 2010.

Because Rogers has failed to demonstrate that the defendants were aware the Report was probably false, she cannot show that defendants acted with malice.

DISPOSITION

The order granting defendants' motion to strike the defamation claims is affirmed.

Defendants shall recover their costs on appeal.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.

25